[626 NYS2d 61]

YOI-LEE REALTY CORPORATION, Appellant, v 177TH STREET REALTY ASSOCIATES et al., Respondents.

First Department, February 14, 1995

### APPEARANCES OF COUNSEL

*Ron Kaplan,* New York City, for appellant.

*Mark Krassner* of counsel, New York City *(Cohen & Krassner,* attorneys), for respondents.

### OPINION OF THE COURT

SULLIVAN, J. P.

The following facts are germane to this appeal from the grant of summary judgment in favor of defendants upon their first counterclaim.

Plaintiff Yoi-Lee Realty Corporation and defendant 177th Street Realty Associates, on or about August 29, 1991, entered into a written contract of sale and executed various survival agreements, collectively referred to as the contract of sale, by which 177th Street was to convey premises known as 12-16 East 177th Street, Bronx, New York, to Yoi-Lee for $367,000, subject to an existing first mortgage securing an outstanding balance of $174,795.55 held by nonparty 1987 Lake Candlewood Estates, Inc. and a $165,204.45 purchase-money second mortgage, the subject of this lawsuit, to be taken back by

177th Street. A closing took place that same day, August 29, 1991, in accordance with the foregoing terms and conditions. As part of the survival agreements, 177th Street represented that it was current in all its obligations under the first mortgage.

Paragraph 43 of the purchase-money second mortgage, executed on August 29, 1991, provided as follows: "It is understood that the Mortgagor shall not be personally liable with respect to the obligation of this mortgage but Mortgagee shall look solely to the value of the mortgaged property in connection with the repayment of the indebtedness." Under its terms, the second mortgage was to be " 'wrapped-around' " a proposed in rem agreement to be entered into on or before September 6, 1991 between the City of New York and 177th Street with respect to tax arrears and other unsatisfied charges against the property in the approximate sum of $36,264. 177th Street failed to enter into the in rem agreement with the City until June 12, 1992, after the commencement of a foreclosure action by the first mortgagee, and never advised Yoi-Lee of that fact, thereby subjecting the conveyed property, by virtue of the unpaid real estate taxes, water and sewer and other charges, to in rem foreclosure by the City as well as foreclosure by the first mortgagee.

On or about February 6, 1992, Lake Candlewood commenced a foreclosure action on the first mortgage on the basis of unpaid real estate taxes and emergency repair liens against the property, which arrears should have been satisfied under the in rem agreement. According to Yoi-Lee, based on information received from a principal of Lake Candlewood, the foreclosure action was prompted and encouraged by defendant Nicholas Chimienti, a partner in 177th Street, "as part of a scheme * * * to benefit himself at the expense of" the other partners of 177th Street and Yoi-Lee.

Thereafter, on March 12, 1992, 177th Street and Lake Candlewood agreed, in writing, that 177th Street would, no later than April 15, 1992, pay all outstanding tax arrears and reimburse Lake Candlewood for its legal expenses incurred in the foreclosure proceeding in return for which that proceeding would be discontinued. 177th Street did not, however, pay its tax arrears by April 15, 1992 or reimburse Lake Candlewood, as promised. Instead, 177th Street commenced an action against the City of New York Department of Housing Preservation and Development, challenging the City's authority to impose and collect charges levied against the property.

In an effort to preserve its equity in the property, Yoi-Lee, on May 22, 1992, entered into a stipulation of settlement with Lake Candlewood calling for the discontinuance of the foreclosure action upon Yoi-Lee's payment, as agreed, of all taxes and charges in arrears with respect to the property and all past-due mortgage principal installments and interest as well as reimbursement of any legal fees, costs and disbursements incurred by Lake Candlewood in connection with the foreclosure proceeding. Pursuant to the stipulation, Lake Candlewood also assigned to Yoi-Lee all its rights against 177th Street under the March 12, 1992 agreement. In accordance with the terms of the stipulation, Yoi-Lee paid $24,156.50 to the City Collector in satisfaction of the unpaid real estate taxes and related charges. Earlier, on June 5, 1992, it had paid Lake Candlewood $5,806.19 in satisfaction of all the mortgage payments due under the first mortgage and $3,471.50 in reimbursement of Lake Candlewood's legal fees and expenses incurred in the prosecution of the foreclosure action. Thus, Yoi-Lee was forced to expend $33,434.19, for which, it contends, 177th Street was liable, to dispose of the foreclosure action. In addition, it claims to have expended an additional $2,214.38 to defend its interests in that action and to have borrowed $40,000 at 10% interest per annum to clear the property of the various charges and liens.

Yoi-Lee also claims additional damage as a result of 177th Street's misrepresentations, which survive the closing. At the closing, 177th Street represented that it had filed J-51 applications with respect to the installation of a new boiler and windows at the premises and that it would provide any documentation necessary to complete the filing process as well as for rent increases for boiler, window, and entrance door installation and painting work. No such documentation has been forthcoming. Instead, 177th Street claims that the J-51 application cannot be processed because of outstanding violations against the premises. Yoi-Lee claims that the violations are for plumbing and boiler installation work performed by 177th Street, which is the only party capable of clearing the violations. Yoi-Lee estimates the value of the J-51 benefit to be $100,000 over the life of the tax abatement.

177th Street also represented at the closing that the City had not done any emergency repair work that would result in charges against the premises and agreed to indemnify and hold Yoi-Lee harmless in that regard in the amount of $5,000. After the closing, Yoi-Lee discovered that charges for emer-

gency repairs were levied against the property in the sum of $2,873.51 and received notice that the City would be recouping $286 per month for four months in the aggregate amount of $1,144 for emergency repair work performed in one of the apartments. 177th Street has disclaimed any responsibility for these repairs or charges.

On June 17, 1992, 177th Street served a written notice of default, declaring the entire outstanding balance of principal due, based on Yoi-Lee's failure to pay the monthly interest installments due on the second mortgage note from December 1, 1991 through June 1, 1992. Yoi-Lee thereafter, on or about July 6, 1992 commenced this action, alleging the various noted defaults in 12 causes of action. 177th Street interposed an answer consisting of a general denial and several affirmative defenses as well as a counterclaim seeking $165,203.34 with interest, costs and disbursements, based upon Yoi-Lee's default under the purchase-money mortgage note, and promptly moved for summary judgment on the counterclaim. Yoi-Lee cross-moved for summary judgment dismissing the counterclaim, asserting, *inter alia,* that paragraph 43 of the mortgage relieved it of personal liability for any default under the note and, in any event, a set-off for the monies it expended to protect its equity in the premises as a result of 177th Street's default in its obligations under the contract of sale.

The IAS Court awarded 177th Street summary judgment and denied the cross motion, holding that all of Yoi-Lee's claims were "collateral" to 177th Street's rights under the note and that paragraph 43 of the mortgage "is concerned with execution on the [n]ote after entry of [j]udgment, and cannot be construed as totally vitiating the [n]ote as an enforceable instrument." Execution on the judgment was stayed "in view of the substantial evidence of counterclaims and off-sets." Since Yoi-Lee's claims are inseparable from the counterclaim on the mortgage note, summary judgment should have been denied and the IAS Court's order, to the extent appealed from, should be reversed.

When a viable counterclaim arises from the same underlying transaction as is involved in the main action and is inseparable from or inextricably intertwined with that transaction, summary judgment should be denied. *(See, Regal Limousine v Allison Limousine Serv.,* 136 AD2d 534, 535; *GTE Automatic Elec. v Martin's Inc.,* 127 AD2d 545, 547.) The mortgage note is inseparable from the mortgage, to which the note expressly refers, and from which the note incorporates

provisions for default. *(See, Tonkonogy v Seidenberg,* 63 AD2d 587.)* The contract of sale, including the survival agreements, are an integral part of the same transaction since they evidence the consideration for which the note was given in the first instance. If Yoi-Lee's allegations are credited, and the IAS Court, in staying execution on the award of judgment, properly refused to reject them summarily, the note and mortgage agreement and contract of sale are appropriately viewed as emanating from a single, albeit complex, transaction. Thus, Yoi-Lee's obligations under the note cannot be fairly viewed without reference to 177th Street's covenants under the survival agreements.

■ Nor, to the extent that its holding in that regard may be looked to as justification for the denial of summary judgment to Yoi-Lee on the cross motion, do we agree with the IAS Court's conclusion that paragraph 43 of the mortgage in question may not be read, as a matter of law, as prohibiting personal recourse against the mortgagor. As plausible as is its interpretation that the clause at issue speaks to the enforcement of any judgment on the note and not the mortgagor's liability thereunder, the fact is that such a limitation is not set forth in the agreement. Courts are repeatedly admonished not to remake the terms of a contract "under the guise of interpretation." *(Rodolitz v Neptune Paper Prods.,* 22 NY2d 383, 386.)* Had the parties intended the interpretation accorded paragraph 43 by the IAS Court, they could have so provided. *(See, Slamow v Del Col,* 174 AD2d 725, 726, *affd* 79 NY2d 1016.)

By the same token, contracts should be construed to give force and effect to their provisions *(see, Chock 336 B'way Operating v Comanche Props.,* 163 AD2d 36, 39, *lv denied* 77 NY2d 802)* and not in a manner so as to render them meaningless *(see, Two Guys from Harrison v S.F.R. Realty Assocs.,* 63 NY2d 396, 403).* The interpretation urged by Yoi-Lee would cast the note and mortgage in conflict and render the note meaningless. This conflict creates an issue of fact for resolution at trial. Since Yoi-Lee's other factual arguments are for the most part put in dispute by defendant Chimienti's affidavits, the cross motion was properly denied.

■ Finally, 177th Street's argument that, as a practical matter, Yoi-Lee is not aggrieved by the award of summary judgment against it because of the stay of execution, should be rejected. Here, since summary judgment on the counterclaim should have been granted as a matter of law, the question

whether Yoi-Lee is aggrieved is irrelevant. In any event, even with the stay, Yoi-Lee is aggrieved; it has a substantial money judgment entered against it.

Accordingly, the order of the Supreme Court, Bronx County (Bertram Katz, J.), entered September 9, 1993, which, to the extent appealed from, granted defendants' motion for summary judgment on their first counterclaim, should be reversed, on the law, with costs and disbursements, and the motion denied.

ROSENBERGER, ELLERIN, KUPFERMAN and WILLIAMS, JJ., concur.

Order, Supreme Court, Bronx County, entered September 9, 1993, reversed, on the law, with costs and disbursements, and the motion for summary judgment denied.