[951 NYS2d 19]

Banco Espírito Santo, S.A., et al., Respondents, v Concessionária Do Rodoanel Oeste S.A., Appellant.

First Department, September 18, 2012

**APPEARANCES OF COUNSEL**

*Quinn Emanuel Urquhart & Sullivan*, New York City (*Philippe Z. Selendy* of counsel), for appellant.

*Pillsbury Winthrop Shaw Pittman LLP*, New York City (*David M. Lindley* and *Jay D. Dealy* of counsel), for respondents.

## OPINION OF THE COURT

RENWICK, J.

■ Plaintiffs, multinational financial institutions and "hedge providers," commenced this breach of contract action when defendant decided to pay off $895 million in loans before their maturity, concomitantly triggering its right to prematurely terminate the interest rate swaps it had entered into with plaintiffs. An interest rate swap is a liquid financial derivative instrument in which two parties agree to exchange interest rate cash flows, based on a specified notional amount from a fixed rate to a floating rate or vice versa. The central dispute in this appeal is whether the interest rate swap agreements required defendant to pay plaintiffs an early termination fee, referred to in the interest swap agreements as a "Close Out Amount," for terminating the swaps prior to their maturity. Plaintiffs argue that the different punctuation of the term "Close Out Amount" in the swap agreements ("Close-out Amount" versus "Close Out Amount") creates an ambiguity as to the meaning of the

term. We hold that the different punctuation of the term does not alter the manifest intention of the parties as gathered from the language employed in the agreement, which unambiguously provides that neither party owes any "Close Out Amount" upon voluntary prepayment of the loans.

Defendant Concessionária Do Rodoanel Oeste S.A. (Rodoanel), part of a large private infrastructure company, was upgrading and operating a toll road in São Paolo, Brazil. In 2009, Rodoanel entered into $895 million in loans and derivative interest-rate swaps to finance the project. Rodoanel was the "borrower" and nonparty banks Inter-American Development Bank and Japan Bank for International Cooperation were the "Senior Lenders." Plaintiffs Banco Espírito Santo, S.A., Caixa Banco de Investimento, S.A. and Crédit Agricole Corporate & Investment Bank (plaintiffs), the "hedge providers," entered into separate interest rate swaps agreements with Rodoanel.

The $895 million senior loans at issue here were governed by certain agreements between Rodoanel and the senior lenders, primarily the Common Terms Agreement (Senior Lender CTA) which is governed by New York law. The senior loans imposed a floating rate of interest. To protect the senior lenders and Rodoanel from the risk of the latter defaulting on loan payments caused by sudden spikes in interest rates, however, the Senior Lender CTA required Rodoanel to enter into derivative interest rate swap transactions.[1] On December 3, 2009, Rodoanel entered into three such substantively identical transactions with plaintiffs, which are all large and sophisticated multinational financial institutions and "hedge providers."[2] The practical effect of these derivative swap transactions was to convert Rodoanel's payment obligations under its loan with the senior lenders from a floating rate to a fixed rate.

These interest rate swap transactions were each governed by a 2002 Master Agreement published by the International Swaps

---

1. In addition, foreign currency swaps (which are not in dispute here) were required to protect against the diminished value of the Brazilian currency. This was because Rodoanel generated revenues from the toll roads in Brazilian Reais, while the senior loans were US dollar loans bearing interest at a variable rate.

2. Banco Espírito Santo, S.A. and Caixa Banco de Investimento, S.A. are headquartered in Portugal, and Crédit Agricole Corporate & Investment Bank is headquartered in France.

and Derivatives Association (ISDA),[3] with one agreement between Rodoanel and each plaintiff bank. These forms are called ISDA Master Agreements, which are used in many thousands of interest rate swap transactions each year (*see Thrifty Oil Co. v Bank of Am. Natl. Trust & Sav. Assn.*, 322 F3d 1039, 1042-1043 [9th Cir 2003]). Each ISDA Master Agreement is executed together with a schedule (ISDA Schedule), which serves the purpose of customizing the parties' contractual arrangement by reflecting any deviations from the standard language of the Master Agreement, as well as any specific terms that have been negotiated by the parties (*id.* at 1043).[4]

The ISDA Master Agreements at issue here are governed by New York law and provide for disputes to be resolved by New York courts. Each ISDA Master Agreement executed by Rodoanel and each plaintiff bank states in its introduction that "this 2002 Master Agreement . . . includes the schedule ([ISDA] 'Schedule'), and the documents and other confirming evidence . . . exchanged between the parties or otherwise effective for the purpose of confirming or evidencing th[eir] Transactions."

It appears that after the swap agreements were executed, the pertinent floating interest rate dropped precipitously, making the interest rate swap agreements very favorable to plaintiffs. Accordingly, on February 11, 2011, Rodoanel gave notice of its intention to prepay the senior loans, and on May 16, 2011 prepaid them. Section 2 of the Senior Lender CTA sets forth Rodoanel's rights and obligations with respect to prepayment of the senior loans. In particular, section 2.8 gives Rodoanel the right to prepay the senior loans, and provides that, in such case, "[n]o prepayment penalties or premiums shall apply to any prepayments." In addition, as noted, prepayment of the senior loans caused the interest rate swaps to terminate automatically before maturity.

Upon this early termination, plaintiffs demanded that Rodoanel pay them the "Close-out Amounts." With regard to

---

**3.** ISDA is a global trade association representing participants in the private-negotiated derivatives industry. ISDA was chartered in 1985, and currently has over 600 member institutions from 46 countries on six continents (*see* www.isda.org).

**4.** *See* Bernadette Muscat, *OTC Derivatives: Salient Practices and Developments Relating To Standard Market Documentation*, Bank of Valletta Rev, No. 39, at 37-38 (2009), available at http://www.bov.com/filebank/documents/32-47%20Bernadette%20Muscat.pdf; Ray I. Shirazi, *Fundamentals of Swaps & Other Derivatives 2011*, 1911 PLI/Corp 49 [2011]; John C. Hull, Options, Futures, & Other Derivatives [4th ed 2000]).

early terminated transactions, the ISDA Master Agreement defines "Close-out Amount" as having two components: (a) the cost of replacing the group of terminated transactions (including the costs of liquidating them and of obtaining new funding) and (b) the value of the remaining rights under the terminated transactions (the market-to-market or MTM amount, i.e., the net present value of expected future cash flows from the swap transaction).[5]

Rodoanel refused to pay any "Close-out Amounts," citing the ISDA Schedule's provision that "[i]f an Additional Termination Event [prepayment] occurs, *no Close Out Amount* shall be payable under this Agreement" (emphasis added). Subsequently, plaintiffs commenced this breach of contract action for Rodoanel's breach of the Senior Lender CTA and ISDA agreements in refusing to pay the MTM amount (the second component of the Close-out Amount). In essence, plaintiffs claim that the "Close Out Amount" term in the ISDA Schedule was only meant to include liquidation cost (the first component of the Close-out Amount) and thus Rodoanel was only relieved of the obligation to pay liquidation cost, but still had to pay the MTM.

Rodoanel answered and simultaneously moved for summary judgment dismissing the complaint, essentially relying on the four corners of the contract alone, namely the ISDA Schedule's "Close-out Amount" provision. In response, plaintiffs rely upon the unique punctuation of the term "Close Out Amount" in the ISDA Schedule, which differs from the punctuation of the same term "Close-out Amount" in the ISDA Master Agreement, where there is a hyphen and "out" is not capitalized. The differing punctuation of the same term, plaintiffs argue, creates an ambiguity of the meaning of the term, which can only be resolved by extrinsic evidence. Apparently agreeing with plaintiffs that the different punctuation creates an ambiguity, Supreme Court allowed parol evidence to aid in its interpretation and found that plaintiffs submitted sufficient evidence to raise an issue of fact as to whether the term *"Close Out Amount"*

5. These "Close-Out Amounts" are often referred to as market-to-market or MTM amounts because the ISDA Master Agreement states that "Close-Out Amounts" are to be determined using "commercially reasonable procedures" including information such as "market data" or "market quotations" from third parties. Thus, in the case of an interest rate swap, this is generally done by determining the value of the projected cash flow expected to be generated by the party under the swap until maturity (i.e., the market-to-market value of the swap).

in the ISDA Schedule, differs from the term *"Close-out Amount"* in the ISDA Master Agreement.[6]

The fundamental rule of contract interpretation is that agreements are construed in accord with the parties' intent (*see e.g. Slatt v Slatt*, 64 NY2d 966 [1985]), and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing" (*Slamow v Del Col*, 79 NY2d 1016, 1018 [1992]). Thus, a written agreement that is clear and unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous (*see e.g. W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]).

As indicated, the central dispute in this appeal is the meaning of the term "Close Out Amount." Where the parties dispute the meaning of particular contract terms, the task of the court is to determine whether such terms are ambiguous. The existence of ambiguity is determined by examining the " 'entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed,' " with the wording viewed " 'in the light of the obligation as a whole and the intention of the parties as manifested thereby' " (*Kass v Kass*, 91 NY2d 554, 566 [1998], quoting *Atwater & Co. v Panama R.R. Co.*, 246 NY 519, 524 [1927]) "read in the context of the entire agreement" (*W.W.W. Assoc.*, 77 NY2d at 163; *see Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 60 AD3d 61, 67 [1st Dept 2008], *affd* 13 NY3d 398 [2009]).

A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning" (*Greenfield v Philles Records*, 98 NY2d 562, 570 [2002]). Parol evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous (*Innophos, Inc. v Rhodia, S.A.*, 38 AD3d 368, 369 [1st Dept 2007], *affd* 10 NY3d 25 [2008]).

Conversely, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings" (*New York City Off-Track Betting Corp. v Safe Factory Outlet*,

---

**6.** For example, plaintiffs assert that, during negotiations, Rodoanel said it would not pay the component of the Close-out Amount consisting of the costs for liquidating a terminated transaction (as opposed to the MTM component) if the senior loans were prepaid because, during the 2008-2009 troubled market, banks were seeking to pass on their added liquidation costs to borrowers. The parties therefore allegedly understood that the provision in the ISDA Schedules that no "Close Out Amount" would be payable if the swaps were terminated due to prepayment.

*Inc.*, 28 AD3d 175, 177 [1st Dept 2006] [internal quotation marks omitted]). Whether a contract is ambiguous presents a question of law for resolution by the court (*Kass*, 91 NY2d at 566).

■ In the instant case, the ordinary and natural meaning of the agreement's words are dispositive. Examination of the entire interest rate swap agreement supports defendant's position that the term "Close-out Amount" in the ISDA Master Agreement and "Close Out Amount" in the ISDA Schedule have the same definition. The ISDA Master Agreement provides for "early termination events," which, as the term implies, enables a party to terminate the transaction early if a termination event occurs with respect to the other party. Upon an early termination, the ISDA Master Agreement sets out the procedure to calculate the "Close-out Amount." The early termination events subject to the "Close-out Amount" were as follows: (1) illegal act; (2) force majeure; (3) tax event; (4) tax event upon merger; and (5) credit event upon merger. The prepayment of the senior loans was not included as an early termination event.

The ISDA Master Agreement, however, contemplates that additional termination events may be added via the ISDA Schedule. This is because the ISDA Master Agreement includes the term "Additional Termination Event" as an early terminating event and then defines such term as "any 'Additional Termination Event' [that] is specified in the schedule." The particular ISDA Schedules executed by the parties in this case similarly specified prepayment of the senior loan as an early termination event. But, the schedule further provides that if an early termination event, namely prepayment, "occurs, no Close Out Amount will be payable under this Agreement." Thus, unlike the early termination events listed in the ISDA Master Agreement, which are subject to "Close out Amount" computation, the additional termination events added in the schedule are explicitly excluded from the "Close-out Amount" computation. This clear and unambiguous language appears to deal a coup de grace to the breach of contract claims advanced by plaintiffs, particularly since any deviation from the ISDA Master Agreement in the ISDA Schedule serves the purpose of customizing the parties' contractual arrangements as negotiated by the parties (*see Finance One Pub. Co. Ltd. v Lehman Bros. Special Fin., Inc.*, 414 F3d 325, 340 [2d Cir 2005], *cert denied* 548 US 904 [2006]).

■ Nevertheless, plaintiffs argue that the different punctuation of the same term means that the terms have different

meanings, i.e., that the "Close Out Amount" term in the ISDA Schedule was only meant to include liquidation cost (the first component of the Close-out Amount of the Master Agreement) and thus Rodoanel was only relieved of the obligation to pay liquidation cost, but still had to pay the MTM. Such construction seems unreasonable and even irrational considering that the purported alternative definition is neither defined in the schedule nor anywhere else. Ambiguity in a written agreement only exists if there is more than one reasonable interpretation of the language at issue (*see Chimart Assoc. v Paul*, 66 NY2d 570, 573 [1986]). Moreover, the ISDA Schedule explicitly states that a "[t]erm[ ] used but not defined [therein] shall have the [same] meaning set out in the [CTA]." Thus, since "Close Out Amount" is not defined in the schedule, its definition in the Master Agreement controls.

Under the circumstances, it is evident that plaintiffs' strained interpretation of the term "Close Out Amount" is an attempt to rework that term's plain meaning in the ISDA Master Agreement. At the heart of plaintiffs' attempt to narrow the definition of the term "Close Out Amount," within the context of early termination due to prepayment of the senior loan, rests upon the undoubted fact that early termination provisions are, in the commercial sense, relevant to the value of interest rate swap transactions. After all, an interest rate swap is merely a transfer of interest rate exposure and, as such, it has market value exposure.[7]

Indeed, the reason the market-to-market value of the derivative interest rate swaps was in favor of plaintiffs at the time of termination was because they—not Rodoanel—had been benefitting from the difference between their obligation to make payments based on what turned out to be a lower floating interest rate, and their right to receive payments based on the higher fixed rate. In other words, due to the interest rate swaps, Rodoanel was paying interest at the higher fixed rate, even though floating rates were low.

If plaintiffs, who are commercially sophisticated "hedge providers," had intended that, in the event of an early termination, the party "in the money" was entitled to retain the benefits of this favorable market condition, they could easily

---

7. *See* Robert T. Daigler, Managing Risk with Financial Futures: Hedging, Pricing, and Arbitrage 52 (1993); Bruce Tuckman, Fixed Income Securities: Tools for Today's Market 173 (1995) ("The final value of the position . . . depends on the evolution of interest rates over the life of the contract").

have expressed this intent in the language of the interest rate swap agreement. For instance, the agreement could have been written in such a way that defendant's obligations under the swap agreement remained, even if the senior loan was fully satisfied, unless defendant paid the remaining market value for the swap transactions. However, because the interest rate swap agreements were "instrument[s] . . . negotiated between sophisticated, counseled business people negotiating at arm's length" (*see Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004] [internal quotation marks omitted]), it is untenable that the parties would have intentionally left a key meaning of their agreements to such vagaries as placement and punctuation. This is especially true given the obvious need for "commercial certainty" in these $895 million loan/hedge transactions (*id.*).

Ultimately, this case serves as a reminder that, in a contract containing punctuation marks, the words and not the punctuation guide us in its interpretation (*see* 17A CJS Contracts § 406; 12 Am Jur Contracts § 256). Punctuation is always subordinate to the text and is never allowed to control its meaning (*Sirvint v Fidelity & Deposit Co. of Md.*, 242 App Div 187, 189 [1st Dept 1934], *affd* 266 NY 482 [1934]; *see also* 17A Am Jur 2d Contracts § 366 [2011]; 68A NY Jur 2d Insurance § 869). Of course, punctuation in a contract may serve as a guide to resolve an ambiguity that has not been created by punctuation or the absence therein, but it cannot, by itself, create ambiguity (*Wirth & Hamid Fair Booking Inc. v Wirth*, 265 NY 214 [1934]; *see also Stoddart v Golden*, 179 Cal 663, 178 P 707 [1919]; *Randolph v Fireman's Fund Ins. Co.*, 255 Iowa 943, 124 NW2d 528 [1963]). It is a cardinal principle of contract interpretation that mistakes in grammar, spelling or punctuation should not be permitted to alter, contravene or vitiate manifest intention of the parties as gathered from the language employed (*Sirvint*, 242 App Div at 189; *Wirth & Hamid Fair Booking*, 265 NY at 219).

Finally, we reject plaintiffs' argument that the Senior Lender CTA provides them a substantive right to receive a "Close Out Amount" upon termination of the swaps due to prepayment of the senior loans. Plaintiffs' argument that they were intended third-party beneficiaries of the Senior Lender CTA is refuted by the documentary evidence. For instance, section 8.14 of the Senior Lender CTA agreement states, in a paragraph entitled "No Third Party Beneficiaries," that such

agreement "is solely for the benefit of the Borrower, and no other Person . . . shall have any rights hereunder against any Senior Lender with respect to the Senior Loans, the proceeds thereof or otherwise." Courts have relied upon similar language to dispose of claims of third-party beneficiary status (*see e.g. Greece Cent. School Dist. v Tetra Tech Engrs., Architects & Landscape Architects, P.C.*, 78 AD3d 1701, 1702 [4th Dept 2010] [contractual provision stated that nothing therein "shall create a contractual relationship with or a cause of action in favor of a third party"]; *First Keystone Consultants, Inc. v DDR Constr. Servs.*, 74 AD3d 1135, 1137 [2d Dept 2010] [contractual provision stated that the parties to the agreement "do not intend to confer any benefit under this Agreement on anyone other than the parties, and nothing contained in this Agreement will be deemed to confer any such benefit on any other person"]). Likewise, the Senior Lender CTA expressly provides in the section defining "Required Hedges," section 3.2.12, that plaintiffs' banks' rights vis-à-vis Rodoanel and the interest rate swaps would be governed by separate contracts, further negating any claim of third-party beneficiary status. Thus, even though the practical effect of the swap may have been to provide defendant with the financial equivalent of fixed-rate financing, the terms of the loan agreements make clear that defendant had distinct obligations under the senior loan agreements and under the interest rate swap agreements.

Even construing the loan and swap agreements as parts of a single transaction, nothing in the loan agreement conflicts with the plain language of the ISDA's Schedule that "[i]f an Additional Termination Event [prepayment] occurs, no Close Out Amount shall be payable under this Agreement." For instance, the Senior Lender CTA, as stated in schedule 9, merely requires that "[t]erms of the Required Hedges shall be a *Contrato Global de Derivativos* . . . form or an ISDA form (2002)." In other words, schedule 9, by its own terms, identifies two forms of acceptable derivative contracts, but says nothing about the parties' rights to negotiate the substance of those hedges—let alone whether "Close-out Amounts" would be payable upon termination of the swaps—so long as they otherwise complied with the requirements of the hedging program set forth in the schedule.

Moreover, section 2.10.1 of the Senior Lender CTA simply requires, in the event of a voluntary prepayment of the senior loans, that Rodoanel comply with the terms of its ISDA Master Agreements and Schedules. Specifically, section 2.10.1 provides in relevant part:

"On the date of any prepayment of the Senior Loans pursuant to Section 2.8 (*Voluntary Prepayment*) or Section 2.9 (*Mandatory Prepayment*), the Borrower shall simultaneously pay . . . the amount required to cause a corresponding reduction in the notional amounts set forth in any Required Hedge Agreement relating to interest rates or foreign exchange rates and any Settlement Amounts incurred in connection therewith."

The term "Settlement Amount" is defined to mean "the amount payable by [Rodoanel] *pursuant to the terms of any Required Hedge Agreement* in connection with an early termination, in whole or in part thereof" (emphasis added). The term "Required Hedge Agreement" is defined to include the ISDA Master Agreements. As explained above, those agreements unambiguously provide that neither party owes any "Close Out Amount" upon voluntary prepayment of the senior loans.

In sum, we agree with defendant that it acted within the unambiguous terms of the ISDA Master Agreement and Schedule when it refused plaintiffs' demand of a "Close Out Amount" payment upon the earlier termination of the interest rate swap due to defendant's prepayment of the senior loans. Plaintiffs have therefore failed to state claims for breach of contract under either the senior loans or interest rate swap transactions.

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered on or about March 9, 2012, which denied defendant's motion for summary judgment dismissing the complaint, should be reversed, on the law, with costs, and the motion granted. The Clerk is directed to enter judgment accordingly.

Tom, J.P., Andrias, Friedman and Moskowitz, JJ., concur.

Order, Supreme Court, New York County, entered on or about March 9, 2012, reversed, on the law, with costs, and the motion granted. The Clerk is directed to enter judgment accordingly.