*CP III Rincon Towers, Inc. v. Richard D. Cohen*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 29th day of November, two thousand sixteen.

Present:
> RALPH K. WINTER,
> DEBRA ANN LIVINGSTON,
> DENNY CHIN,
> *Circuit Judges*.

---

CP III RINCON TOWERS, INC.,

      *Plaintiff-Appellant*,

    v.                      14-1463

RICHARD D. COHEN,

      *Defendant-Appellee*.

---

| | |
|---|---|
| For Plaintiff-Appellant: | BARRY W. LEE, Manatt, Phelps & Phillips, LLP, San Francisco, CA (Kimo S. Peluso, Nirav S. Shah, New York, NY, on the brief) |
| For Defendant-Appellee: | JANICE MAC AVOY, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, NY (Justin Santolli, Jesse Ryan Loffler, on the brief) |

Appeal from a judgment of the United States District Court for the Southern District of New York (Batts, *J.*)

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **VACATED**, and the case is **REMANDED** for further proceedings consistent with this order.

Plaintiff-Appellant CP III Rincon Towers, Inc. ("CP III") appeals from a judgment entered on April 7, 2014 in the United States District Court for the Southern District of New York (Batts, *J.*) granting Defendant-Appellee Richard D. Cohen's motion for summary judgment on CP III's claim, which sought enforcement of certain provisions of a guaranty agreement Cohen had signed. We assume the parties' familiarity with the facts, procedural history of the case, and the issues on appeal.

## A. Background

In 2005, Beacon Capital Partners ("Beacon") purchased a mixed-use development project in San Francisco (the "Project"). The Project included a high-rise apartment building (the "Property") with 320 units that Beacon intended to convert into condominiums. Cohen is a successful real estate investor who, in 2007, indicated an interest in purchasing the Property from Beacon. Cohen set up three special purpose entities, Rincon EV Realty LLC, Rincon ET Realty LLC, and Rincon Residential Towers LLC (collectively, "Borrower"). Cohen serves as president of all three LLCs. In order to purchase, and subsequently develop, the Property, Cohen needed to secure financing, and he wished to do so quickly to take advantage of tax benefits for like-kind exchanges. Cohen contacted Bear Stearns Commercial Mortgage, Inc. ("Bear Stearns"; it, and each of its successors, the "Lender") seeking $110 million in financing. Negotiations began in mid-May and continued for approximately three weeks.

2

Because Bear Stearns anticipated that, at least initially, the net operating income from the Property would be less than the interest due, Bear Stearns required Cohen to enter into an agreement guaranteeing the loan in his personal capacity. Cohen agreed to the guaranty in concept, but sought to cabin his liability under the guaranty in practice. The record reflects that the parties thereafter engaged in substantial negotiations over the terms of that guaranty. On June 8, 2007, Borrower and Bear Stearns entered into a $110 million loan agreement (the "Loan Agreement"). Cohen and Bear Stearns entered into an accompanying agreement as to the guaranty (the "Guaranty Agreement"), the terms of which are discussed in greater detail below.

Under the Loan Agreement, Borrower was required to invest in renovations of the Property. Angotti & Reilly ("Angotti") was hired as the Property's general contractor, and Angotti, in turn, retained, as one of its subcontractors, a company called Interior Design Services. In late 2008, Borrower issued only a conditional payment to Agnotti, asserting Angotti's work was unsatisfactory, and on December 23, 2008, Angotti filed a notice and claim of mechanic's lien in the amount of $766,420.30. Interior Design Services also filed a mechanic's lien, in the amount of $142,700.51. Two other companies – Bacon Plumbing Co., Inc. and Allsite Construction Company – also filed mechanics liens, which, together, totaled approximately $100,000.

Agnotti subsequently brought its claims to arbitration. The arbitrator awarded Agnotti over $1.5 million, including amounts past due, attorneys' fees, and costs. This award was thereafter confirmed in California state court. On June 7, 2010, Agnotti recorded a judgment lien against the Property.

Borrower was separately party to a common development agreement administered by Beacon (the "REOA"), under which certain easements and covenants necessary to the Project

3

had been established. The Loan Agreement required Borrower to remain current with the payments required by the REOA, and to comply with all of its terms. By mid-2008, Borrower had fallen into arrears on its payments under the REOA, and, on December 23, 2008, Beacon recorded a notice of delinquency and a claim of lien against Borrower for nearly $700,000. This initial lien was released in January of 2009, but, by May, Beacon had filed another claim for about $650,000, later amended down to a claim for just over $400,000. We refer to these liens collectively – Angotti's original lien, the mechanic's liens, Angotti's judgment lien, and the lien filed pursuant to the REOA – as the "Disputed Liens."

The term of the loan ran through mid-2009, though Borrower sought to exercise its contingent contractual right under the Loan Agreement to extend the term of the loan through June 2010. By this time, rights under the Loan Agreement had passed from Bear Stearns to a vehicle created by the Federal Reserve Bank of New York during the financial crisis that began in 2007 to hold certain of the assets that JPMorgan Chase & Co. declined to assume as part of its government-backed acquisition of the Bear Stearns parent company. In early 2010, the loan was sold to CP III at auction for about $83 million. CP III waited until after June 12, 2010 – the maturity date on the loan if Borrower had legitimately exercised its right to extend the term of the loan – to file notice of default and seek to foreclose on the Property. CP III acquired the Property at the subsequent foreclosure sale with a credit bid of $73 million. To recover on the unpaid loan, CP III filed suit against Cohen in the Southern District of New York, alleging that the recording of the Disputed Liens triggered Cohen's personal liability under the Guaranty Agreement.

4

**B. The Guaranty Agreement**

The Guaranty Agreement provides for a springing, rather than an absolute, guaranty. In other words, the loan itself is structured to be non-recourse with respect to Cohen, except that, under the Guaranty Agreement, certain events trigger Cohen's personal liability. Cohen's liability under the Guaranty Agreement is bifurcated: in some circumstances, Cohen's liability is merely "loss recourse," requiring Cohen to cover losses sustained by the Lender as a result of Borrower's failure to comply with certain of the obligations imposed by the Loan Agreement, while in other circumstances, the guaranty becomes "full recourse," exposing Cohen to liability for the entire amount of the loan.[1]

Particularly relevant here are three provisions of the Guaranty Agreement triggering full recourse to Cohen: the Indebtedness Clause, the voluntary Lien Clause, and the Transfer Clause. The subsection in which the Indebtedness Clause and the voluntary Lien Clause appear states that Cohen shall be liable for the entire amount of the debt "if Borrower fails to obtain Lender's prior written consent to any Indebtedness . . . or voluntary Lien encumbering the Property (to the extent such consent is required under the Loan Agreement[)]." App'x 23. The Transfer Clause makes the loan full recourse to Cohen "if Borrower fails to obtain Lender's prior written consent to any Transfer if required by the Loan Agreement . . . ." *Id.*

"Indebtedness," "Lien," and "Transfer" are all defined terms under the Loan Agreement, incorporated by reference into the Guaranty Agreement. The Loan Agreement defines "Indebtedness" as the sum of, *inter alia*, "(a) all indebtedness or liability . . . and (g) obligations

---

[1] Loss- and full-recourse provisions like the ones Cohen agreed to are frequently termed "bad boy guarantees." Bad boy guarantees are frequently required by lenders providing financing to special purpose entities, often in real estate transactions, to permit the lender to pursue the individual controlling the special purpose borrower for actions that undermine the value of the lender's collateral. However, as is the case here, these "bad boy guarantees" are by and large a creature of contract and we therefore apply general principles of contract interpretation in construing their scope.

secured by any Liens, whether or not the obligations have been assumed (other than the Permitted Encumbrances and Permitted Equipment Financing)." App'x 49-50. "Lien" is defined as "any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances." App'x 52.

A "Transfer" occurs when Borrower, by action or inaction does, *inter alia*, any of the following: "sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein." App'x 102. The Loan Agreement further provides that "Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's Transfer without Lender's consent. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer." App'x 103.

## C. Proceedings Below

On April 7, 2014, the district court denied CP III's motion, and granted Cohen's cross-motion, for summary judgment. The district court held that, under the plain language of the Loan and Guaranty Agreements, any Lien – including the Disputed Liens at issue here – would trigger the Guaranty Agreement's Transfer Clause, but found the Guaranty Agreement

6

ambiguous because reading the Transfer Clause this broadly would render the voluntary Lien Clause superfluous. The district court therefore turned to the extrinsic evidence, concluding that the course of negotiations demonstrated that the parties had not intended that the Disputed Liens trigger Cohen's full recourse guaranty. As further support for its conclusion, the district court found that allowing the Disputed Liens to trigger full recourse liability would be commercially unreasonable, because the Guarantor had no control over when and whether the companies conducting the renovations on the Property contemplated by the Loan Agreement might file a lien. Finally, the district court concluded that though certain of the Disputed Liens undoubtedly constituted "liabilities," and so Indebtedness under the Loan Agreement, the Indebtedness Clause had not been triggered because the Loan Agreement did not require written consent prior to incurring these Disputed Liens and the Indebtedness Clause, by its terms, applies only to debts for which the Loan Agreement requires the Lender's prior written consent.

### D. Discussion

We review the district court's grant of summary judgment *de novo*, drawing all factual inferences against the party seeking summary judgment, and affirm only when there are no genuine issues of fact to be resolved at trial. *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 253-54 (2d Cir. 2002). In the context of a contract dispute, a motion for summary judgment is generally granted only where the agreement's language is unambiguous and conveys a definite meaning.[2] *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993).

---

[2] Pursuant to the terms of the Guaranty Agreement, we apply New York law in interpreting the parties' contract.

The primary objective of contract interpretation is to give effect to the intent of the contracting parties "as revealed by the language they chose to use." *Id.* We do not resort to extrinsic evidence unless the contract's language itself is ambiguous; if, in the context of the entire agreement, the plain meaning of the text is clear, our inquiry ends there. *Id.* at 1095. We have explained that ambiguity exists when contract language is not susceptible of "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (internal quotation marks and modifications omitted).

The core of CP III's argument is that the Disputed Liens triggered the Transfer Clause and, independently, the Indebtedness Clause, of the Guaranty Agreement, thus making Cohen personally liable for the full amount of the debt. As described above, the Loan Agreement defines Transfers broadly, and as including any encumbrance of the Property, whether Borrower agreed to so encumber the Property or not, and whether the encumbrance occurred by operation of law or otherwise. The Transfer covenant in the Loan Agreement indisputably requires that, except as otherwise specifically provided, Borrower obtain the Lender's written consent prior to any Transfer. Because a lien against the Property is, by definition, an encumbrance, the Disputed Liens – whether incurred voluntarily or not – were Transfers for which Borrower needed to obtain the Lender's prior written consent. Neither party credibly contends that Borrower obtained the required consent with respect to each of the Disputed Liens. Thus, looking solely to the Transfer Clause of the Guaranty Agreement, the Disputed Liens would trigger Cohen's personal liability.

However, as the district court recognized, this reading of the Transfer Clause is in some tension with the provision of the Guaranty Agreement immediately prior to it. Under the

8

voluntary Lien Clause, voluntary Liens on the Property recorded without the prior consent of the Lender (and for which such prior consent is required) trigger Cohen's full recourse liability. As is clear, and as the definition of the term in the Loan Agreement reiterates, an encumbrance on the Property would constitute a Lien. As applied to encumbrances, therefore, the Transfer Clause covers much the same substantive territory as the voluntary Lien Clause. Thus, if we read the voluntary Lien Clause as identifying a subset of Liens triggering full recourse to Cohen, that clause would be entirely subsumed within the scope of the Transfer Clause that immediately follows it. In other words, the voluntary Lien Clause would be superfluous.

It is well-established that we disfavor readings of a contract that render provisions of an agreement superfluous. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002). This is reflected in the basic rule that "contracts should be construed to give force and effect to their provisions and not in a manner so as to render [those provisions] meaningless." *Yoi-Lee Realty Corp. v. 177th St. Realty Assocs.*, 208 A.D.2d 185, 190 (1st Dep't 1995); *see also Columbus Park Corp. v. Dep't of Hous. Pres. & Dev.*, 80 N.Y.2d 19, 31 (1992) ("[A] construction which makes a contract provision meaningless is contrary to basic principles of contract interpretation."). Though superfluity is not necessarily fatal to a contract, we do take the fact that a given interpretation would render a provision superfluous into account in evaluating whether the relevant provisions, read together, are ambiguous. *See RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003).

Here, the tension between the voluntary Lien Clause and the Transfer Clause, and between the opposing principles of contract interpretation which would support giving effect to one clause or the other, renders the Guaranty Agreement ambiguous. If we were to give full effect to the Loan Agreement's expansive definition of Transfer, we would necessarily be

9

rendering the voluntary Lien Clause a nullity, contrary to the principle that we seek to give effect to every provision of an agreement. *See Golden Gate Yacht Club v. Société Nautique de Genève*, 12 N.Y.3d 248, 256-57 (2009). On the other hand, giving the voluntary Lien Clause independent meaning requires carving encumbrances out of the Transfer Clause, cutting against the rule that the meaning the parties have clearly ascribed to a term in their agreement (here, "Transfer") is controlling. *See Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 469 (2d Cir. 2010); *Banco Espírito Santo, S.A. v. Concessionária do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 107-08 (1st Dep't 2012). Absent a clearer explanation for how these clauses should be coordinated solely by reference to the four corners of the agreement, the Guaranty Agreement's treatment of encumbrances like the Disputed Liens is ambiguous.

Finding the agreement ambiguous, the district court turned to extrinsic evidence to resolve the question whether the Disputed Liens triggered full recourse to Cohen. In particular, to establish the status of the Disputed Liens under the agreement, the district court looked to the course of negotiations between the parties, including the proposed and final modifications to the draft contract. This analysis focused specifically on the removal of a provision in an early draft of the agreement which provided for loss recourse in the event of Borrower non-payment of bills for labor, materials, or other similar charges which, in the absence of payment, would generate liens against the Property (the "Mechanic's Lien Clause"). Observing that, if the parties removed the loss recourse trigger embodied in the Mechanic's Lien Clause, the parties presumably did not expect mechanic's liens to trigger full-recourse liability, the district court held this drafting history to have conclusively resolved the parties' intended treatment of all Disputed Liens under the Guaranty Agreement.

10

Given the posture of this case, this determination was inappropriate. Standard rules governing the disposition of motions for summary judgment apply to resolving ambiguities in a contract, and, therefore, as a general rule, we leave determination of the parties' intent to the ultimate factfinder. *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 158 (2d Cir. 2000). Though, as discussed immediately below, this general rule demands refinement, none of our clarifications of the rule make the grant of summary judgment suitable in this case.

First, paralleling the general rule on summary judgment, extrinsic evidence can help to set the interpretation of a contract at summary judgment where the evidence "is so one-sided" that no reasonable factfinder could read the contract differently. *Id.* at 159. However, this is not the case here. As CP III points out, removal of the Mechanic's Lien Clause had no substantive effect on the rights of the parties, because the revised draft that followed provided for loss recourse in nearly identical circumstances under a clause (the "SPE Clause") triggered upon Borrower's breach of the Loan Agreement's special purpose entity covenant.[3] While it is true that the parties removed the Mechanic's Lien Clause, incorporation of the more-expansive SPE Clause – which provides for loss recourse whenever Borrower has "Liens of any nature against it" – undermines the inference that the parties intended to remove coverage of all liens similar to the Disputed Liens from the contract.[4] App'x 65. Put simply, it is the rare circumstance when

---

[3] The Loan Agreement defines a "Special Purpose Entity" as, *inter alia*, an entity that "has no judgments or Liens of any nature against it except for tax liens not yet due and the Permitted Encumbrances." App'x 65. Borrower covenanted to maintain its status as a Special Purpose Entity so long as the loan was outstanding. Though the Guaranty Agreement refers to a "Single Purpose Entity" rather than a Special Purpose Entity, neither party contends that this is anything other than scrivener's error.

[4] We need not give definitive meaning to the SPE Clause to recognize that its inclusion creates an open factual question not properly resolved on summary judgment.

11

an alteration without apparent legal effect conclusively resolves the meaning of the parties' contract.

Moreover, the mere fact that the Mechanic's Lien Clause was removed in the course of the parties' negotiations does not resolve the textual ambiguity the district court was confronted with. Insofar as it reflects on the meaning of ambiguous text or the import of facially conflicting provisions of a contract, extrinsic evidence can be useful. In such a case, extrinsic evidence can allow the court to discern the intended meaning of the ambiguous language. *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003). In other words, such evidence can sometimes clarify the meaning of the explicit terms of the agreement. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 430 (2d Cir. 1992) (holding that "because the interrelationship of the two provisions . . . is susceptible to several reasonable interpretations . . . [i]t cannot be definitely and precisely gleaned which reading was intended by the parties" and extrinsic evidence is properly considered).

That is not the case here. At most, the removal of the Mechanic's Lien Clause reflects that the parties did not intend Borrower's failure to pay for labor, materials or other charges, which failure could generate a lien against the Property as a matter of state law, to operate as a full recourse trigger. But this evidence does not clarify the interaction between the voluntary Lien and Transfer Clauses. Even if the extrinsic evidence suggests that the Transfer Clause should not be read to apply to the liens formerly covered by the Mechanic's Lien Clause, the import of this evidence is purely negative: it identifies only one specific set of liens that the Transfer Clause does not cover. This evidence does not reflect whether the Transfer Clause applies to liens not covered by the Mechanic's Lien Clause, such as the liens entered pursuant to the Angotti judgment and the terms of the REOA. It also does not clarify whether the voluntary

12

Lien Clause displaces the Transfer Clause, or, if it does, the scope of the carve-out from full recourse liability implied by the voluntary Lien Clause.[5] Because the extrinsic evidence neither supplies an unambiguous interpretation of the terms of the Guaranty Agreement nor indisputable evidence of the parties' intent with respect to the interaction between the Transfer and voluntary Lien Clauses, the district court should not have resolved these ambiguities on summary judgment.[6] We therefore vacate the district court's grant of summary judgment in favor of Cohen on this point and remand for further proceedings.

The district court also incorrectly granted summary judgment to Cohen with respect to the Indebtedness Clause. The entirety of the subsection of the Guaranty Agreement containing the Indebtedness and voluntary Lien Clauses provides for full recourse "if Borrower fails to obtain Lender's prior written consent to any Indebtedness (provided such Indebtedness exceeds $250,000.00 or if any such Indebtedness is in the form of mezzanine debt or preferred equity) or voluntary Lien encumbering the Property (to the extent such consent is required under the Loan Agreement[)]" App'x 23. The district court correctly understood the phrase "prior written consent" to mean what it says, an interpretation that is only further confirmed by the closing parenthetical. As a result, this provision of the Guaranty Agreement is triggered only when Borrower has both failed to obtain Lender's prior written consent for, for instance, Indebtedness, *and* was required to obtain such consent under to the terms of the Loan Agreement. The district court held that, because the Loan Agreement did not require the Lender's written consent prior to

---

[5] In this respect, we note that the term "voluntary Lien" is not self-defining.

[6] For similar reasons, analysis of the commercial reasonability of the agreement is insufficient, absent an accompanying clear interpretation of the agreement's terms, to resolve the ambiguity in the Guaranty Agreement. *See Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010).

Borrower's incurring the liabilities embodied in the Disputed Liens, the Disputed Liens did not trigger this full recourse provision of the Guaranty Agreement.

However, the district court did not fully consider the interaction between this provision of the Guaranty Agreement and the special purpose entity provisions of the Loan Agreement. As CP III points out, the special purpose entity covenant in the Loan Agreement requires Borrower to secure consent from the Lender prior to taking any action affecting Borrower's special purpose entity status.[7] As noted above, the term "Special Purpose Entity" is defined broadly, and, as relevant here, its definition provides that each special purpose entity "shall have no Indebtedness other than (i) the Loan, (ii) liabilities incurred in the ordinary course of business . . . in amounts not to exceed [$1,000,000] which liabilities are not more than sixty [] days past the date incurred . . . and (iii) such other liabilities that are permitted pursuant to [the Loan] Agreement." App'x 63.

For one of the special purpose vehicles used by Cohen to hold the Property to incur more than one million dollars in ordinary course Indebtedness without obtaining the Lender's prior written consent to Borrower's carrying such liabilities forward would, therefore, plainly be a breach of the Loan Agreement's special purpose entity covenant. The district court did not, however, consider whether, and under what circumstances, the same might trigger full recourse to Cohen under the Guaranty Agreement as Indebtedness for which the Lender's prior written consent is required under the Loan Agreement.[8] Because it did not reach this question, the district court also did not have the opportunity to evaluate how the interaction between these

---

[7] All consents required under the Loan Agreement must be in writing.

[8] We note, however, that the district court correctly rejected Cohen's argument that a broad reading of the Guaranty Agreement's full recourse provisions would make the Guaranty Agreement's loss recourse SPE Clause – triggered upon breach of the Loan Agreement's special purpose entity covenant – superfluous.

14

provisions of the two agreements would affect the treatment of the Disputed Liens under the Guaranty Agreement.   We decline to consider these questions in the first instance, and therefore vacate and remand the matter to the district court for further proceedings.

*     *     *

We have considered the parties' remaining arguments and find them to be without merit. Accordingly, we **VACATE** the judgment of the district court and **REMAND** for further proceedings consistent with this order.

FOR THE COURT:<br>
Catherine O'Hagan Wolfe, Clerk