## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PHILIP H. GEIER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 10931-VCS** |
| | : | |
| MOZIDO, LLC, a Delaware | : | |
| limited liability company, and | : | |
| MOZIDO, INC., a Delaware | : | |
| corporation, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: September 1, 2016
Date Decided: September 29, 2016

John M. Seaman, Esquire and David A. Seal, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware, and Phillip Frankel, Esquire of Bond, Schoeneck & King, PLLC, Syracuse, New York, Attorneys for Plaintiff.

Raymond J. DiCamillo, Esquire and Sarah A. Clark, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Marc E. Kasowitz, Esquire, Albert Shemmy Mishaan, Esquire, Kanchana Wangkeo Leung, Esquire, and Danielle R. Gill, Esquire of Kasowitz, Benson, Torres & Friedman LLP, New York, New York; and Constantine Z. Pamphilis, Esquire of Kasowitz, Benson, Torres & Friedman LLP, Houston, Texas, Attorneys for Defendant Mozido, LLC.

John G. Harris, Esquire of Berger Harris LLP, Wilmington, Delaware; Stephen G. Grygiel, Esquire of Silverman, Thompson, Slutkin & White, LLC, Baltimore, Maryland Attorneys for Defendant Mozido, Inc.

SLIGHTS, Vice Chancellor

Plaintiff, Philip H. Geier, initiated this action to recover damages for the value of incentive options that allegedly were promised to him by Mozido LLC ("LLC") in exchange for his service on LLC's board of directors but never delivered.[1] The options in question would have allowed Geier to acquire 1% of the equity of LLC for $135,000—a stake he now alleges to be worth millions of dollars. His claims sound in breach of contract, unjust enrichment and, as to Inc., tortious interference with contract.

Defendants have moved to dismiss all claims under Court of Chancery Rule 12(b)(6). They argue first and foremost that the operative complaint fails to plead the existence of a contract and therefore has failed to state a claim for breach of contract. Next they argue that Geier cannot plead in the alternative that he is entitled to recover from LLC for unjust enrichment because he has elected to plead that his rights to the options arise from contract. Even if the Court determines that Geier has stated a claim for either breach of contract or unjust enrichment, however, Defendants argue that the complaint must be dismissed in any event because Geier released any claim he may have had to the options when entities affiliated with Geier executed a general release of claims to settle related litigation

---

[1] The defendants are Mozido LLC and Mozido, Inc. In their briefs, for ease of reference, the parties referred to Mozido LLC as "LLC" and Mozida Inc. as "Inc." I will adopt these abbreviations here.

in New York state court. Because I find that Geier released all claims asserted here as part of this previous settlement, the motions to dismiss must be granted.

## I. FACTS

Consistent with Court of Chancery Rule 12(b)(6), I have drawn the facts from the well-pled allegations in the Second Amended Verified Complaint, documents incorporated therein by reference and other judicially noticeable facts.[2]

Beginning in 2011, various representatives of LLC asked Geier more than once to join LLC's Board of Directors ("the Board") and to make an investment in LLC. In several letters offering Geier a position on the Board, Michael Liberty, a majority investor and Vice Chairman of LLC, offered Geier the option to acquire membership units in LLC. By letter dated March 6, 2012, Gregory Corona, then-CEO of LLC, renewed the invitation for Geier to join LLC's Board and again referenced incentive options for Geier to acquire 1% of the then-issued and outstanding membership units in LLC (the "Options").

---

[2] *See Solomon v. Armstrong*, 747 A.2d 1098, 1126 n.72 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000); *see also Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (noting that the Court may consider documents "integral to a plaintiff's claim and incorporated into the complaint" when deciding a motion to dismiss).

Geier agreed to join the Board and countersigned the March 6, 2012 letter.[3] He served on the LLC Board from March 2012 until he resigned on or about May 10, 2013.

In the spring of 2012, Liberty approached Geier about making a loan to LLC because LLC needed to raise cash quickly. In July 2012, Geier caused the Philip H. Geier Irrevocable Trust (the "Geier Trust") and The Geier Group, LLC (the "Geier Group") to loan $3 million to Mobile Money Partners, LLC, a Liberty affiliate that appears also to be a member of LLC, pursuant to a promissory note and a related consulting agreement. Geier is a trustee of the Geier Trust and Chairman of the Geier Group. The Promissory Note was personally guaranteed by Liberty and Richard Braddock, who was then on the Board and a member of LLC.

After a default on the Note, the Geier Trust and the Geier Group commenced an action in the New York Supreme Court to enforce the promissory note and recover the loan with interest. To resolve this litigation Liberty and Braddock executed a confession of judgment in favor of both the Geier Trust and the Geier Group. Braddock paid the judgment and then sought reimbursement from Liberty and his affiliates, including LLC, by commencing a separate action in Florida.

---

[3] The parties dispute the extent to which this letter constitutes a binding contract to grant the Options to Geier—Geier argues that the March 6 letter is an enforceable contract; the Defendants argue that it is at best an unenforceable agreement to agree.

3

On November 18, 2013, Braddock executed a settlement agreement with Liberty, LLC and others pursuant to which he released several claims, including any claims to any equity interest in LLC (the "Braddock Settlement"). At the same time, Liberty and LLC also sought to obtain a release from Geier, the Geier Trust and Geier Holdings.[4] An early draft of this release specifically listed Geier individually as a releasor and included a carve-out for Geier's claim to the Options.[5] The final version of the release, titled simply "General Release," dated November 18, 2013, removed Geier as a signatory, leaving the Geier Trust and the Geier Group as the named releasors. It contained no carve-out for any claim Geier may have had against LLC, including any claim relating to the Options.[6] The General Release was executed on behalf of the releasors by Hope Smith, a trustee of the Geier Trust and manager of the Geier Group.

In November 2013, LLC assigned all its rights and interests in United States common law and federally registered trademarks, international trademark applications and registrations, U.S. patents, and goodwill to Inc., a subsidiary of

---

[4] The Braddock Settlement Agreement references the General Release at issue here and notes that it is "to [be] deliver[ed] to the "Mozido Parties," as defined in the Braddock Settlement Agreement. The reference does not describe the scope of the General Release but does note that the release is "from . . . the Geier Parties" defined as the "Philip H. Geier Jr. Irrevocable Trust and the Geier Group, LLC." Verified Second Amended Complaint ("Compl.") Ex. G, ¶ 2(1).

[5] Compl. Ex. H.

[6] Compl. Ex. I.

LLC that was formed as part of a significant capital infusion and restructuring. Inc. assumed certain liabilities of LLC but purportedly did not assume any liability for the Options.

Geier alleges that he has repeatedly demanded that LLC or Inc. issue his Options and has unsuccessfully attempted to exercise the Options since he left the Board in May 2013. Geier did not make a formal demand to exercise his rights to the Options, however, until October 10, 2014, when he sent a letter to that effect to Robert E. Turner, who was then the Chairman of LLC.

## II. STANDARD OF REVIEW

The standard of review is well settled. A motion to dismiss under Rule 12(b)(6) should be denied if the plaintiff could recover "under any reasonably conceivable set of circumstances susceptible of proof."[7] The Court will assume the truth of all well-pled facts in the complaint and draw all reasonable inferences in the plaintiff's favor,[8] but need not give weight to conclusory allegations.[9]

## III. ANALYSIS

If the General Release extends to Geier in his individual capacity and releases his claims against LLC and Inc. related to the Options ("the Option

---

[7] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs.*, LLC, 27 A.3d 531, 536 (Del. 2011).

[8] *Id.*

[9] *Malpiede v. Townson*, 780 A.2d 1075, 1082–83 (Del. 2001).

5

claims"), then I need not address the parties' arguments regarding the merits of the Option claims and the motions to dismiss must be granted. Therefore, I turn first to the scope and effect of the General Release.

## A. Applicable Tenets of Contract Construction Relating to Releases

The General Release, by its terms, is governed by New York Law. According to New York law, the interpretation of a release is for the court to undertake as a matter of law, and therefore is appropriate for disposition on a motion to dismiss.[10] This is especially so if the Court determines that the agreement is unambiguous and can be interpreted by reference to the document itself.[11]

When the language of a release is clear and unambiguous, the Court will give effect to the intention of the parties as evidenced by the language within the four corners of the document.[12] The court will consider extrinsic evidence to ascertain the meaning or scope of the release only when there is an ambiguity in

---

[10] *See, e.g.*, *LeMay v. H.W. Keeney, Inc.*, 508 N.Y.S.2d 769, 770 (N.Y. App. Div. 1986).

[11] *Id.*

[12] *Id.*

6

the release itself.[13] However, the parties may not offer, and the court may not consider, extrinsic evidence to create ambiguity.[14]

Where parties are sophisticated and represented by counsel, and the language of the release is clear, New York courts are even more inclined to look only to the language of the release to ascertain objectively the parties' intent with respect to the scope of the release.[15] In this regard, I note that New York courts do draw a distinction between releases among sophisticated parties on the one hand, and releases among individuals or among less sophisticated individuals and businesses on the other (for instance in the personal injury context).[16] As between businesses and other sophisticated parties, New York courts will construe releases strictly and in accordance with their express terms.[17] In cases involving less sophisticated parties, the courts are more inclined to look beyond the release at the context of the settlement and other surrounding circumstances in order to discern

---

[13] *Innophos, Inc. v. Rhodia, S.A.*, 882 N.E.2d 389, 392 (N.Y. 2008).

[14] *See Rubycz-Boyar v. Mondragon*, 790 N.Y.S.2d 266, 267 (N.Y. App. Div. 2005).

[15] *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977) (applying New York law).

[16] *See id.* at 1114–15 (describing the different approaches courts take when construing releases entered into by sophisticated versus unsophisticated parties).

[17] *Id.* at 1115.

the intent of the parties to the release.[18]  The General Release at issue here was between sophisticated parties represented by competent counsel.[19]  The Court's focus, therefore, must be on the terms of the General Release itself.

A general release will be construed most strongly against the releasor,[20] and will "bar[] an action on any cause of action arising prior to its execution."[21]  Since a general release bars all pre-existing claims between the releasor and releasee, if a releasor seeks to limit the release, New York courts require that the releasor expressly do so in the release itself.[22]

## B. The General Release Bars the Option Claims

Geier offers two arguments as to why the General Release should not be interpreted as a bar to the Option claims.  First, he contends that the General Release must be read in conjunction with documents executed by the parties to the

---

[18] *Id.* at 1114–15 (stating that the courts will generally look to the intent of the parties when a release contains no ambiguities within its four corners in personal injury and other similar cases involving unsophisticated parties only "where mistake, fraud, or overreaching against an individual is suspected").

[19] Compl. ¶ 6 ("Plaintiff is a respected business leader, internationally recognized in the fields of communication, venture capital, marketing, entrepreneurship and business development, and is the former chair and CEO of Interpublic Group of Companies, where he served for over 20 years"); ¶ 12 ("Liberty valued Plaintiff's personal reputation and business acumen as assets. . . .").

[20] *Consorcio Prodipe v. Vinci*, 544 F.Supp. 2d 178, 189 (S.D.N.Y. 2008) (applying New York law).

[21] *Mergler v. Crystal Props. Assoc.*, 583 N.Y.S.2d 229, 230 (N.Y. App. Div. 1992).

[22] *In re Schaefer*, 221 N.E.2d 538, 540 (N.Y. 1966).

Braddock Settlement, which reflect that the General Release actually was intended to release only claims relating to the $3 million loan the Geier Trust and the Geier Group made to the Liberty affiliate. Second, he contends that the terms of the General Release reveal that he was not an intended releasor. I disagree on both counts.

### 1. The General Release Was Not Modified by the Braddock Settlement

The General Release is expressly captioned "General Release;" it contains no carve-outs or limitations.[23] Nor does it contain any recitals that might add

---

[23] The General Release, in its entirety, reads:

*To All To Whom These Presents Shall Come Or May Concern, Know That:*

Philip H. Geier Jr. Irrevocable Trust and The Geier Group, LLC, as RELEASORS, in consideration of the sum of Ten Dollars (10.00) and other good and valuable consideration, received from Michael Liberty, Peter Smith, Greg Corona, Ric Duques, Robert Selander, Ira Levy, Mozido, LLC, Brentwood Investments, LLC, Brentwood Financial, LLC, Mobile Money Partners, LLC, and Family Mobile, LLC, as RELEASEES, receipt whereof is hereby conclusively acknowledged, release and discharge the RELEASEES and the RELEASEES' affiliates, subsidiaries, parents, heirs, executors, administrators, successors, predecessors and assigns or anyone acting on behalf of any or all of the foregoing persons, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, known or unknown, in law, admiralty or equity, which against the RELEASEES, the RELEASORS and the RELEASORS' affiliates, subsidiaries, parents, heirs, executors, administrators, successors, predecessors and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter,

9

context or reflect the intent of the parties. Since there is no ambiguity within the four corners of the General Release, and it was prepared by sophisticated parties and their counsel, neither the Braddock Settlement documents nor the earlier drafts of the release may be used to construe the agreement or create ambiguity about whether Geier was intended as a party or whether the Option claims were intended to be excluded from the General Release.

Geier contends that the General Release is a component part of the Braddock Settlement and, therefore, should be construed along with the recitals in the Braddock Settlement documents that expressly limit the scope of that settlement. He argues under New York law that writings that "form part of a single transaction and are designed to effectuate the same purpose [must] be read together."[24]

---

cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE.

In addition, the RELEASORS agree not to issue, make or publish any statement, whether orally or in writing, by electronic or any other means, to any person or persons, that disparages any of the RELEASEES.

The words "RELEASORS" and "RELEASEES" include all releasors and all releasees under this RELEASE.

This RELEASE may not be changed orally.

This release shall be governed by and construed in accordance with the laws of the State of New York.

Compl. Ex. I.

[24] *Genger v. Genger*, 76 F.Supp. 3d 488, 496 (S.D.N.Y. 2015) (alteration in original) (internal quotation marks omitted) (applying New York law).

10

Geier's recitation of New York law regarding the construction of demonstrably unified contracts is accurate as far as it goes but it stops short of being complete. New York also embraces the general notion that contracts should be read separately unless their "history and subject matter show them to be unified."[25] While this inquiry often is fact intensive, it should be performed by the court as a matter of law where the parties' intent may be determined by looking only within the four corners of the contract.[26] Factors such as the identities of the parties, mutual dependence of the contracts, absence or presence of any cross-reference, and the contracts' different purposes are relevant to determining the intent of the parties.[27] While "form" is not dispositive, "that the parties entered into separate written agreements with 'separate assents' rather than a 'single assent' is influential."[28] And a conclusory allegation within a complaint that otherwise clear language in a standalone contract actually means something else

---

[25] *Cty. of Suffolk v. Long Island Power Auth.*, 954 N.Y.S.2d 619, 623 (N.Y. App. Div. 2014) (quoting *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 921 N.Y.S.2d 94, 97 (N.Y. App. Div. 2011)).

[26] *Schron v. Grunstein*, 917 N.Y.S.2d 820, 824 (N.Y. Sup. Ct. 2011); *aff'd sub nom. Schron v. Troutman Sanders LLP*, 963 N.Y.S.2d 613 (N.Y. 2013).

[27] *Id.*

[28] *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 873 (N.Y. 1972) (internal citations omitted) (holding that "the conclusion of separateness" was "all but inescapable" when the agreements at issue involved "formally different parties" and were executed on different dates within the same month).

when read alongside a separate but allegedly related contract "is not enough to create an ambiguity sufficient to raise a triable issue of fact."[29]

Here, the General Release and the Braddock Settlement were executed separately, and among different parties. There are separate assents and no indication that the parties intended that the General Release would not stand on its own. While the General Release was referenced in and attached to the Braddock Settlement documents, nothing within the four corners of the General Release indicates that it is contingent upon or related to the Braddock Settlement. Any professed fealty to New York's objective theory of contracts would be hollow if I was to take the General Release, which is clear on its face, and inject it with terms from the Braddock Settlement documents in order to alter the intent of the contracting parties as expressed in the General Release. The General Release must be interpreted within its four corners.[30]

---

[29] *Schron,* 917 N.Y.S.2d at 825 (quoting *Innophos, Inc. v. Rhodia, S.A.*, 832 N.Y.S.2d 197, 199 (N.Y. App. Div. 2007)).

[30] While I appreciate that evidence of the circumstances or context in which a contract is executed may be admitted to assist in the construction of the contract's terms, *see, e.g.*, *67 Wall St. Co. v. Franklin Nat. Bank*, 333 N.E.2d 184, 186–87 (N.Y. 1975), I cannot conclude that any such circumstantial evidence would alter the construction of the General Release, particularly given the sophistication of the parties and the breadth of its clear and unambiguous terms. *Id.* (explaining that while evidence of surrounding circumstances of a contract may be admissible to explain ambiguities or aid in the construction of its terms, it must be excluded where it is offered to vary or contradict the unambiguous terms of the contract).

## 2. Geier is a Releasor

The General Release expressly identifies the Geier Trust and the Geier Group as releasors.  It also expressly provides that claims the releasors' "affiliates, subsidiaries, and parents" "ever had, now have or hereafter can have" against the releasees are released.[31]  The parties disagree whether the term "affiliate" would include Geier individually.  Defendants contend that Geier is clearly an "affiliate" of the Geier Trust and the Geier Group based on that term's ordinary meaning.  Geier urges the Court to determine that "affiliate" is ambiguous and to allow the parties to take discovery regarding the parties' intent with respect to this term.

Contract provisions should be interpreted consistently with the general purpose of the contract.[32]  Since one can discern on the face of the General Release that its purpose is to effect a broad release of claims, intended to cover any pre-existing claims the releasors may have against the releasees, it is appropriate to interpret the term "affiliate," as used in the General Release, broadly as well.[33]  In determining the meaning of "affiliate," standard dictionary definitions are

---

[31] Compl. Ex. I.

[32] *Smith v. City of Buffalo*, 992 N.Y.S.2d 816, 818 (N.Y. App. Div. 2014).

[33] *See In re El-Roh Realty Corp.*, 902 N.Y.S.2d 727, 730 (N.Y. App. Div. 2010) (interpreting provisions of an agreement which had the primary purpose of preserving the closely-held nature of a corporation consistently with and to give effect to that purpose).

13

instructive,[34] including: "an affiliated person or organization,"[35] "being close in connection, allied, associated, or attached as a member or branch,"[36] or "[s]omeone who controls, is controlled by, or under common control with an issuer of a security."[37]

Geier's complaint indicates that he was in control of both the Geier Trust and the Geier Group. Indeed, the complaint alleges that when LLC sought a loan from Geier, he directed the Geier Trust and Geier Group to make the loan.[38] Moreover, as noted, he is a co-trustee of the Geier Trust and Chairman of the Geier Group. While Geier has argued that the term "affiliate" should not apply to him since he is not an entity, I find no principled basis to draw that distinction. If the term "affiliate" would include an entity in control of the Geier Trust or the Geier Group, there is no reason to limit the definition so that an individual in that same position of control would not likewise be deemed an affiliate of the releasors.[39]

---

[34] New York courts, like Delaware courts, will refer to dictionaries to assist in the construction of undefined terms within a contract without offense to the parol evidence rule. *Mazzola v. Cty. of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. 1988).

[35] Merriam-Webster's Collegiate Dictionary 21 (11th ed. 2003).

[36] *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001) (quoting BLACK'S LAW DICTIONARY, 1446 (7th ed. 1999) (applying New York law).

[37] BLACK'S LAW DICTIONARY (10th ed. 2014).

[38] Compl. ¶¶ 46–47.

[39] *See Wachter v. Kim*, 920 N.Y.S.2d 66, 71 (N.Y. App. Div. 2011) ("The word 'affiliate' is not commonly understood to apply only to entities").

Even if Geier did not "control" the Geier Trust or the Geier Group, the only reasonable construction of "affiliate" would still apply to Geier in his individual capacity. Geier indisputably had a "close connection" and "association" with both the Geier Trust as a co-trustee and the Geier Group as Chairman.

I am satisfied that the only reasonable interpretation of the term "affiliate" is that it includes Geier individually as an affiliate of the Geier Trust and the Geier Group. Having interpreted the term in that manner, by the express, unambiguous terms of the General Release, Geier must be deemed a releasor.

**3. Geier Has Released the Option Claims Against Both Defendants**

While Inc. is not explicitly named in the General Release as a releasee, the broad language defining releasee includes any subsidiaries of LLC and the other named releasees. Since Inc. is a subsidiary of LLC, it is a releasee. Accordingly, if the General Release releases Geier's claims against LLC, it also releases his claims against Inc.

According to the General Release, the releasors agreed to release "all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, known or unknown, in law . . . or equity, which against the RELEASEES, the RELEASORS and the RELEASORS' affiliates . . . ever had,

15

now have or hereafter can, shall or may, have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE."[40] This is the classic model of a general release and the Option claims are clearly captured within this broad release language. How could they not be? The Option claims arose prior to the execution of the General Release, were or should have been well known to Geier at that time and are not specifically or even implicitly carved out.[41] They are, therefore, barred by the General Release.

## IV. CONCLUSION

Based on the foregoing, the motions to dismiss must be GRANTED.

**IT IS SO ORDERED.**

---

[40] Compl. Ex. I.

[41] *See* Compl. ¶¶ 29–31 (stating that Geier believed no further documentation for his Option was necessary when he began serving on the Board in March 2012 and that he resigned on or about May 10, 2013); ¶ 59 (stating that Geier had repeatedly attempted to assert his Option claims since leaving the Board, on or about May 10, 2013); ¶¶ 52–53 (discussing the drafting of the Geier Release, where earlier drafts included a carve-out for Geier's claims to the Option); Ex. H (showing an earlier draft of the release specifically excluding Geier's claims to the Option).