(March 22, 2007)

■ INNOPHOS, INC., Formerly Known as PHOSPHATES ACQUISITION, INC., Respondent, v RHODIA, S.A., et al., Appellants. [832 NYS2d 197]—

Order, Supreme Court, New York County (Ira Gammerman, J.H.O.), entered June 14, 2005, which, in an action for breach of contract, granted plaintiff's motion for partial summary judgment declaring that certain claims asserted against plaintiff constitute taxes as defined in the parties' agreement and that any guarantee required to contest these claims is defendants' responsibility, affirmed, without costs.

In August 1994, plaintiff Innophos paid more than $530 million to acquire Rhodia Fosfatados and other specialty phosphate businesses from defendants. The purchase and sale agreement requires that defendants indemnify plaintiff for all "Taxes" assessed for periods prior to the closing date. Three months after the deal closed, the Comisión Nacional del Agua (CNA) (National Water Commission), an agency of the Mexican government, assessed Innophos Fosfatados (the successor in interest to Rhodia Fosfatados) in excess of $130 million dollars for outstanding water extraction fees between 1998 and 2002. According to plaintiff, defendants had received notice of an audit of their water usage and had been aware of these outstanding water usage fees well in advance—indeed months—prior to closing, but defendants never advised plaintiff.

Upon receiving formal notification of the outstanding fees, plaintiff requested that defendants indemnify it pursuant to the agreement. Defendants did not, and, consequently plaintiff commenced this action. Plaintiff moved for partial summary judgment, and the motion court found that the Mexican government's assessment is a tax as defined by the agreement, and, to the extent a guarantee was required to further contest the CNA assessment, defendants were obligated to provide it.

We agree. The agreement defines "Tax or Taxes" as follows: "all . . . United States federal, state or local or non-United States taxes, assessments, charges, duties, levies or other similar governmental charges of any nature, including all income, gross receipts, employment, franchise, profits, capital gains, capital stock, transfer, sales, use, occupation, property, excise, severance, windfall profits, stamp, stamp duty reserve, license, payroll, withholding, ad valorem, value added, alternative minimum, environmental, customs, social security (or similar), unemployment, sick pay, disability, registration and other taxes, assessments, charges, duties, fees, levies or other similar governmental charges of any kind whatsoever, whether disputed or not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest."

The relevant issue here is not whether the CNA assessment is a tax under New York or Mexican law, but rather whether the CNA assessment is considered a tax as that term is defined in the parties' agreement. Here, the parties were involved in a sophisticated, multimillion dollar business transaction governed by a detailed 76-page purchase agreement. They chose to define the term "Tax or Taxes" with broad, sweeping language. The language, "or other similar charges of any kind whatsoever," is all-encompassing, not limiting, and, indeed, broad enough to cover the government assessment at issue.

When a written agreement is clear and unambiguous on its face, "extrinsic and parol evidence is not admissible to create an ambiguity" (*Intercontinental Planning v Daystrom, Inc.*, 24 NY2d 372, 379 [1969]; *see also W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 163 [1990]). Indeed, "mere assertion by a party that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity sufficient to raise a triable issue of fact" (*New York City Off-Track Betting Corp. v Safe Factory Outlet, Inc.*, 28 AD3d 175, 177-178 [2006]). Had the parties wished to limit this expansive verbiage by requiring that their contractual definitions would only be enforceable if consistent with New York or Mexican law, they could have easily provided for such specific, enumerated exceptions to their agreement's chosen sweeping words. Indeed, it is highly unlikely, if not utterly unthinkable, that plaintiff had intended to incur a prior debt of this magnitude—i.e., more than $130 million that defendants knew about and failed to divulge, and predated the closing by two to six years—in the absence of clear language that it agreed to assume such an enormous obligation, postclosing.

The dissent maintains that the contractual definition of

"Governmental Order" can be read to include the liability at issue. We disagree and note that the word "assessment" and the phrase "deficiency assessment" are, on the one hand, conspicuously absent from that definition, but, on the other hand, included in the agreement's definition of "Tax or Taxes" and, further, denominated as such in the official notification sent preclosing to defendants. Furthermore, the sweeping language in the agreement's definitions of "Tax or Taxes" specifically mentions "deficiency assessments" almost immediately following "other similar governmental charges of any kind whatsoever," language that also follows equally sweeping language, i.e., "or other similar governmental charges of any nature, including." It is virtually impossible for us to imagine how two sophisticated parties could have made the language any more sweeping than it is.

While we agree that a contract should be interpreted to give meaning to all of its terms, the dissent's strained interpretation would eviscerate language that is obviously intended to cover the charges at issue here. Moreover, as for ejusdem generis, the above-mentioned contractual definition of "Tax or Taxes" is not at all at odds with that principle of statutory construction. Finally, the dissent's reference to the principle noscitur a sociis is unpersuasive mainly because the specific word "assessment" and the specific phrase "deficiency assessments" either precede and/or follow "or other similar governmental charges of any nature" and "or other similar governmental charges of any kind whatsoever," and thus are clearly linguistically connected to, i.e., in the company of, these general phrases.

Defendants maintain that Mexican law prohibits conditioning an appeal on the posting of a guarantee, and, in any event, they have no contractual obligation to provide a guarantee. However, the motion court correctly declared that if collateral is required, defendants must provide it. Indeed, pursuant to the parties' agreement, if defendants assume and control the defense of a third-party claim, it is at their expense (*see* agreement § 7.04 [b]; § 9.02 [b]). Concur—Marlow, J.P., Sullivan, Buckley and Catterson, JJ.

McGuire, J., concurs in part and dissents in part in a separate memorandum as follows: Although Innophos and Rhodia disagree on many things, they have no dispute about how the amounts assertedly due to the Comisión Nacional del Agua (the CNA) were calculated under Mexican law. These amounts (the CNA claims) were calculated by the CNA, an agency of the Mexican federal government, on the basis of the volume of water used by Rhodia Fosfatados de Mexico, S.A. de C.V. (Fosfata-

dos) in the course of its operation of a phosphates plant in Mexico. The principal question on this appeal is whether the CNA claims fall within the scope of the definition of the term "Taxes" in the agreement. In my view, at the very least the scope of this defined term is sufficiently ambiguous so as to preclude acceptance of Innophos' interpretation as a matter of law. Accordingly, I respectfully disagree with the majority's conclusion that Supreme Court properly granted partial summary judgment to Innophos declaring the CNA claims to be claims for "Taxes" under the agreement.

Under article VII of the agreement, Rhodia indemnified Innophos for all "Taxes" incurred prior to closing. Under article IX of the agreement, Rhodia also indemnified Innophos for various "Losses," including those arising from breaches of representations or warranties in the agreement. One such representation was that there were "no Governmental Orders relating to the Business threatened to be imposed on any of the Asset Sellers or the Mexican Subsidiaries by any Governmental Authority." The term "Governmental Order" was broadly defined as "any order, writ, judgment, injunction, decree, stipulation, determination, settlement agreement or award entered by or with any Governmental Authority." In addition, Innophos is indemnified for losses arising from any nondisclosed "Environmental Claims," a term that includes "any and all administrative, regulatory or judicial actions, suits, written demands, demand letters, written claims, notices of non-compliance or violation, proceedings, consent orders or consent agreements pursuant to any Environmental Law."

With exceptions not relevant here, Rhodia has no responsibility to Innophos for the first $15.9 million in "Losses" incurred by Innophos, is fully responsible for all "Losses" over $15.9 million but less than $79.5 million and has no responsibility for any "Losses" exceeding $79.5 million. However, Rhodia's obligation under article VII to indemnify Innophos for all taxes incurred prior to closing is not subject to either the deductible or the cap specified in article IX. Accordingly, if the amounts sought by the CNA fall within the parties' definition of the term "Taxes," Rhodia is potentially on the hook to Innophos for the entire amount (initially, $130 million) claimed by the CNA.

The parties defined the term "Tax" or "Taxes" to mean: "all (I) United States federal, state or local or non-United States taxes, assessments, charges, duties, levies or other similar governmental charges of any nature, including all income, gross receipts, employment, franchise, profits, capital gains, capital stock, transfer, sales, use, occupation, property, excise, sever-

ance, windfall profits, stamp, stamp duty reserve, license, payroll, withholding, ad valorem, value added, alternative minimum, environmental, customs, social security (or similar), unemployment, sick pay, disability, registration and other taxes, assessments, charges, duties, fees, levies or other similar governmental charges of any kind whatsoever, whether disputed or not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest."

Innophos' position, which Supreme Court apparently adopted, is that the CNA claims are "Taxes" because they are sought by a governmental body and, under Mexican law, are considered to be "fees" or "duties." As Rhodia correctly argues, however, Innophos effectively collapses the definition into a single test— whether the claim is a governmental charge of any nature. Under well-settled canons of construction, Innophos' reading of the term "Taxes" is not supportable.

Under Innophos' interpretation of the term "Taxes," the meaning of that term is unaffected by the 30 specific examples of governmental charges specified in the definition that term. That is, the term would have the same meaning if all of the examples were omitted from the definition. Innophos' approach similarly gives no effect to the word "similar" in the general phrase "or other similar governmental charges of any nature," which immediately precedes the 30 specific examples. In both respects, accordingly, Innophos' approach offends the canon of construction that requires a contract to be interpreted so as to give meaning to all its terms (*Greater N.Y. Mut. Ins. Co. v Mutual Mar. Off.*, 3 AD3d 44, 50 [2003]). This canon applies with particular force here, given that the 30 specific examples are immediately followed by the essentially identical phrase, "or other similar governmental charges of any kind whatsoever." Surely the repetition of the phrase further indicates the significance to the definition of not only the phrase and each word in the phrase, including the word "similar," but also of the 30 specific examples that shed light on the meaning of the phrase.

Although Innophos' position disregards them, two other related canons of constructions—ejusdem generis and noscitur a sociis—are implicated by the definition of the term "Taxes." Under the former, "a series of specific words describing things or concepts of a particular sort are used to explain the meaning of a general one in the same series" (*Matter of Riefberg*, 58 NY2d 134, 141 [1983]); under the latter, the meaning of a word or phrase is "known from its associates" (McKinney's Cons Laws of NY, Book 1, Statutes § 239 [a]) or "determined by the company it keeps" (*242-44 E. 77th St., LLC v Greater N.Y. Mut.*

*Ins. Co.*, 31 AD3d 100, 103-104 [2006] [internal quotation marks and citation omitted]). Thus, the phrases "or other similar governmental charges of any nature" and "or other similar governmental charges of any kind whatsoever" must be interpreted in light of the 30 specific examples.

Rhodia's position, by contrast, is consistent with these canons of construction. According to Rhodia, the general phrase encompasses "traditional tax-related matters," "the functional equivalent of taxes" or "other governmental charges that are in the nature of taxes." To be sure, this effort to give meaning to the agreement's definition of the term "Taxes" is circular. Although Innophos for this reason assails Rhodia's position as "analytically bankrupt," this circularity is not a basis for rejecting Rhodia's position. The agreement itself merely asserts the similarity of all 30 examples without explaining or defining that similarity. Presumably, if the parties had conceived of an analytic basis for capturing that similarity, they would have stated it rather than only assert the similarity and attempt to illustrate it with a series of examples.

Whatever the difficulties of affirmatively stating the way or ways in which the 30 examples of "Taxes" are similar,[1] it is less difficult to state the similarity negatively, by noting an attribute they do *not* share. None of the examples entail a charge by a governmental body for the purchase or use of a commodity. In this key respect, the CNA claims are not "similar" to any of the 30 examples. Innophos protests as "highly misleading" the characterization by Rhodia of the resolutions by which the CNA claims were assessed as "water bills." On the substantive matter of whether the CNA claims were calculated on the basis of

---

1. In his "Preface to a Dictionary of the English Language," Samuel Johnson identified one problem confronting the lexicographer that also may confound the lawyer—perhaps not a similarly harmless drudge—who attempts to define terms used in a complex legal agreement. "To explain, requires the use of terms less abstruse than that which is to be explained, and such terms cannot always be found; for as nothing can be proved but by supposing something intuitively known, and evident without proof, so nothing can be defined but by the use of words too plain to admit a definition" (Samuel Johnson, A Dictionary of the English Language: An Anthology, at 29 [edited by David Crystal] [Penguin Books 2005]). Also relevant here is another aspect of the problem, and a potential solution, identified by Johnson. "Ideas of the same race, though not exactly alike, are sometimes so little different, that no words can express the dissimilitude, though the mind easily perceives it, when they are exhibited together . . . ." (*Id.* at 30.)

the volume of water used at the phosphates plant, however, there is no dispute.[2]

Innophos' position on the scope of the term "Taxes" cannot easily be reconciled with other provisions of the agreement. As noted, Rhodia is obligated, subject to the deductible and cap provisions of the agreement, to indemnify Innophos for losses resulting from the breach of representations or warranties relating to, among other matters, "Governmental Orders" and "Environmental Claims." On the other hand, Rhodia is obligated to indemnify Innophos without regard to the deductible and cap with respect to all preclosing taxes. If essentially all governmental charges fall under the definition of the term "Taxes," to avoid inconsistent indemnification obligations the terms "Governmental Orders" and "Environmental Claims" must be construed to include only such orders and claims that do not impose or threaten to impose a financial charge payable to a governmental body. As Rhodia points out, the term "Governmental Orders" thus would include only injunctive orders that do not require a payment of any kind to a governmental body. The terms "Governmental Orders" and "Environmental Claims," like all words in a written contract, "should not be unnaturally forced beyond their ordinary meaning" (*Brainard v New York Cent. R.R. Co.*, 242 NY 125, 131 [1926]). But just such an unnatural construction of these terms is the consequence of Innophos' interpretation of the term "Taxes." By contrast, Rhodia's interpretation of the term "Taxes" avoids that unhappy consequence and is consonant with the principle that "[a] written contract will be read as a whole, and every part will be interpreted with reference to the whole" (*Matter of Westmoreland Coal Co. v Entech, Inc.*, 100 NY2d 352, 358 [2003] [internal quotation marks and citation omitted]).

Another relevant canon of construction is the one counseling against interpreting a contract so as to produce unreasonable results (*see Fleischman v Furgueson*, 223 NY 235, 241 [1918] ["It is a well-established canon of interpretation that in seeking for the intent of the parties the fact that a construction contended for would make the contract unreasonable may be properly taken into consideration"]). Yet, under Innophos' interpretation of the term "Taxes," if Rhodia, to pose just two examples, rented space in a government-owned building or purchased electric power from a government-owned utility, the

---

**2.** Indeed, apart from referring to the length of the resolutions and the detailed discussion therein of the underlying audit by the CNA, Innophos does not elaborate on its contention that Rhodia's "water-bills" characterization is "highly misleading."

rent and purchase payments would be "Taxes." A court, of course, "may not make or vary [a] contract . . . to accomplish its notions of abstract justice or moral obligation" (*Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]), and so this canon should be applied cautiously. It hardly seems reckless, however, to conclude that these potential results of Innophos' interpretation would be "strange, unnatural and unreasonable" (*Fleischman*, 223 NY at 241).

For these reasons, my view is that the term "Taxes" does not include the CNA claims and that Supreme Court erred in concluding otherwise. But even if I am wrong in concluding that as a matter of law the CNA claims are not "Taxes," I nevertheless conclude that Innophos' motion for summary judgment, which was made prior to any discovery, should not have been granted. Where a contractual provision is ambiguous, "extrinsic evidence is admissible to determine the parties' intent" (*Federal Ins. Co. v Americas Ins. Co.*, 258 AD2d 39, 43 [1999]). And a contractual provision "is ambiguous where a natural and reasonable reading of its language allows for two or more possible meanings" (*Roberts v Consolidated Rail Corp.*, 893 F2d 21, 24 [2d Cir 1989] [construing New York law]). At the very least, Rhodia's reading of the term "Taxes" is reasonable and thus it should have been permitted to pursue extrinsic evidence supporting its position through discovery.

Moreover, Rhodia does point to significant extrinsic evidence. In disclosure schedules attached to the agreement, Rhodia disclosed a dispute with the CNA pursuant to which it was subject to potential duties and fines as a result of waste-water discharges by Fosfatados into the Gulf of Mexico. If the CNA claims are "Taxes" because they are charges payable to a governmental body, the waste-water discharge claims of the same governmental body also must be "Taxes." The waste-water discharge claims, however, were not disclosed by Rhodia in the particular schedule in which, pursuant to the terms of the agreement, tax liabilities were to be disclosed. Rather, they were disclosed in other schedules under the headings, "Litigation," "Environmental . . . Matters" and "Material Contracts." To be sure, Rhodia had a strong economic reason not to characterize these claims as "Tax" matters. But Innophos had a strong economic reason to object to Rhodia's treatment of the waste-water discharge claims as nontax matters. That Innophos did not object—and Innophos does not deny that it did not object—is not consistent with its current position on the scope of the term "Taxes." If the term "Taxes" is ambiguous, this predispute conduct by the parties certainly is relevant (*see Old*

*Colony Trust Co. v Omaha*, 230 US 100, 118 [1913] ["Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence"]; *Estate of Hatch v NYCO Mins.*, 245 AD2d 746, 749 [1997] ["where an ambiguity is present in a contract . . . the subsequent conduct of the parties (may) be used to indicate their intent"]).