21-3013-cv
*Hughes Communications India Private Limited v. The DirecTV Group, Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

August Term, 2022

Argued: February 23, 2023    Decided: June 22, 2023

Docket No. 21-3013-cv

———————

HUGHES COMMUNICATIONS INDIA PRIVATE LIMITED,

*Plaintiff-Appellant,*

— v. —

THE DIRECTV GROUP, INC.,

*Defendant-Appellee.*

———————

Before:

CALABRESI, LYNCH, and ROBINSON, *Circuit Judges.*

———————

Plaintiff-Appellant Hughes Communications India Private Limited ("Hughes India") appeals from a judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*) dismissing its indemnification claims against The DirecTV Group, Inc. ("DirecTV"). The case arises out of an asset purchase agreement in which DirecTV spun off fourteen subsidiaries, including Hughes India (the "Agreement"). The Agreement requires DirecTV to indemnify Hughes India for certain contractually defined "Taxes" that accrued before the closing of the spin-off transaction and "Proceedings" that were initiated prior to the closing date. Hughes India sought a declaration that DirecTV must indemnify it for unpaid license fees, interest, and penalties imposed by India's Department of Telecommunications (the "DOT"). The district court granted summary judgment for DirecTV, concluding that the license fees were not subject to indemnification because they were neither Taxes nor the result of Proceedings against Hughes India as defined by the Agreement. Hughes India appeals.

We agree with Hughes India that under the plain terms of the Agreement, the license fees are Taxes and the Provisional License Fee Assessment (the "Provisional Assessment") issued by the DOT initiated a Proceeding against Hughes India. We conclude that DirecTV is obligated to indemnify Hughes India for license fees, interest, and penalties accrued for tax periods ending on or before closing, and for those amounts related to the Provisional Assessment issued for fiscal years 2001 to 2003, which was the only Proceeding initiated before closing. Accordingly, we **VACATE** the district court's judgment and **REMAND** the case to the district court for further proceedings consistent with this opinion.

———————

KANNON K. SHANMUGAM (William T. Marks, H. Christopher Boehning, Jonathan Hurwitz, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, *for Plaintiff-Appellant*.

NICOLE A. SAHARSKY (Matthew D. Ingber, Niketa K. Patel, Alina Artunian, Avi M. Kupfer, *on the brief*), Mayer Brown LLP, Washington, DC, *for Defendant-Appellee.*

———————

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-Appellant Hughes Communications India Private Limited ("Hughes India") appeals from a judgment of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *J.*) granting summary judgment in favor of The DirecTV Group, Inc. ("DirecTV") on Hughes India's indemnification claims. This dispute stems from an asset purchase agreement (the "Agreement") between the parties whereby DirecTV spun off fourteen of its subsidiaries, including Hughes India. The Agreement requires DirecTV to indemnify Hughes India for certain contractually defined "Taxes" accrued on or before the closing of the transaction and "Proceedings" initiated before the closing.

Prior to the closing, India's Department of Telecommunications (the "DOT") issued Hughes India a Provisional License Fee Assessment (the "Provisional Assessment"), asserting that Hughes India had underpaid its license fees for the use of India's telecommunications spectrum and demanding 245,275,705 Indian rupees – approximately $5.6 million[1] – in payment. Hughes

---

[1] The parties dispute the applicable exchange rate. For the purpose of this appeal, we construe the evidence in the light most favorable to Hughes India and refer to the dollar amount as calculated by Hughes India. *See Picard, Tr. for SIPA*

3

India disputed the charge and began a decades-long action against the DOT in Indian courts. During the pendency of the action, the DOT continued to impose license fees plus interest and penalties for successive fiscal years. After the Supreme Court of India in 2019 affirmed the method by which the DOT determined the assessment for all the years at issue totaled $94 million, Hughes India sued DirecTV in the Southern District of New York, alleging that DirecTV wrongfully denied indemnification of the entire amount under the Agreement.

The district court granted summary judgment for DirecTV, concluding that, as defined by the Agreement, the license fees are not Taxes and the DOT did not initiate a Proceeding against Hughes India. On appeal, we agree with Hughes India that under the plain terms of the Agreement, the license fees are Taxes and the Provisional Assessment initiated a Proceeding against Hughes India. We therefore conclude that DirecTV is obligated to indemnify Hughes India for license fees, interest, and penalties accrued for tax periods ending on or before closing, or those amounts related to the Provisional Assessment issued for fiscal years 2001 to 2003, which was the only Proceeding initiated before closing.

---

*Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 182-83 (2d Cir. 2022). The dollar amount of the assessment is immaterial to this appeal.

Accordingly, we **VACATE** the district court's judgment and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

I.      **Factual Background**

Hughes India is a former satellite telecommunications subsidiary of DirecTV, a satellite service provider, that operates in India pursuant to a telecommunications license granted by the DOT. Pursuant to a 2002 licensing agreement between Hughes India and the DOT (the "Licensing Agreement"), Hughes India agreed to pay the DOT an annual license fee based on a percentage of Hughes India's revenue in exchange for access to India's telecommunications airways (the "license fees"). The Licensing Agreement authorizes the DOT to review Hughes India's quarterly accounting records to ensure that Hughes India accurately paid the required license fees.

In 2004, DirecTV and its wholly-owned subsidiary, Hughes Network Systems, Inc. ("HNS Inc."), entered into an Agreement to spin off fourteen of DirecTV's subsidiaries, including Hughes India, for $190.7 million.[2] The

___

[2] Prior to the closing, Hughes India was an indirect subsidiary of HNS Inc., which was in turn a wholly-owned subsidiary of DirecTV. Pursuant to the Agreement, the spun-off assets (including Hughes India) were transferred to HNS LLC, a

Agreement allocated financial responsibility between the parties based on the closing date.

Under the Agreement, Hughes India is generally responsible for "[a]ll Liabilities relating to or arising under Contributed Assets," App'x 41 § 2.4(a)(ii), including "Communications Licenses," *id.* at 39 § 2.2(a)(xiv). However, DirecTV agreed to indemnify Hughes India for certain contractually defined "Taxes" related to Communications Licenses, payable for tax periods ending on or before the closing date. The Agreement defines Taxes as:

> all federal, state, local and foreign taxes (including income, profit, franchise, sales, use, real property, personal property, ad valorem, excise, employment, social security and wage withholding taxes) and installments of estimated taxes, assessments, deficiencies, levies, imposts, duties, withholdings, or other similar charges of every kind, character, or description imposed by any Governmental Authority, and any interest, penalties, or additions to tax imposed thereon or in connection therewith.

*Id.* at 114. Similarly, the Agreement makes Hughes India responsible for existing "Proceedings" noted in a disclosure schedule and any others "created or incurred on or after Closing." *Id.* at 42-43 §§ 2.4(a)(xii), (xvi). But DirecTV must indemnify

_____

newly formed entity owned by HNS Inc. Following the closing, Hughes India became a subsidiary of HNS LLC.

Hughes India for "[l]iabilities arising out of Proceedings against [Hughes India] . . . initiated prior to the Closing Date," other than those identified in the disclosure schedule. *Id.* at 44 § 2.4(b)(ix). The Agreement defines a Proceeding as:

> any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation that is or has been commenced, brought, conducted or heard at law or in equity or before any Governmental Authority or any arbitrator or arbitration panel.

*Id.* at 112. On March 14, 2005, before the closing date and while the spin-off transaction was still underway, Hughes India received the Provisional Assessment – a provisional license fee assessment from the DOT – seeking payment for underpaid license fees of approximately 245 million Indian rupees (or approximately $5.6 million) for fiscal years 2001 to 2003. The Provisional Assessment noted that a review of Hughes India's self-audited documents revealed a discrepancy and directed Hughes India to pay the amount demanded within ten days or communicate with the DOT within seven days. Hughes India did not remit the amount but disputed the DOT's calculation of the company's adjusted gross revenue in writing and in a meeting.

A little over a month later, on April 22, 2005, the spin-off transaction closed. On November 23, 2005, Hughes India notified DirecTV of the Provisional Assessment and asked whether DirecTV wished to participate in or assume control of the dispute. DirecTV declined to participate, asserting that it was not responsible for paying the license fees. On January 3, 2006, the DOT issued an additional provisional license fee assessment for fiscal years 2003 to 2004.

Ensuing correspondence and meetings between Hughes India and the DOT culminated in a decades-long litigation in India challenging the Provisional Assessment and successive periodic assessments for the years 2005 to 2019 on the basis that the DOT improperly defined adjusted gross revenue to encompass the entire revenue accruing to licensees (*i.e.*, including revenue from non-licensed activities), which in turn increased the amount of license fees owed. While the dispute between Hughes India and the DOT remained ongoing, the DOT continued to impose interest and penalties for unpaid license fees for fiscal years 2001 to 2003, license fee assessments for successive annual periods, as well as additional interest, penalties (assessed at 150% of the principal), and interest on penalties.

In February 2006, Hughes India filed an administrative action against the

DOT before the Indian Telecom Disputes Settlement and Appellate Tribunal (the "Tribunal"). Other telecommunications service providers raised similar challenges to the Tribunal regarding the DOT's definition of adjusted gross revenue, and after consolidating those actions with Hughes India's, the Tribunal ruled in favor of the providers. On October 24, 2019, over ten years after the Tribunal's ruling, the Supreme Court of India reversed the Tribunal's decision, upheld the DOT's approach to computing licensees' adjusted gross revenue, and reinstated the DOT's assessments, interest, and penalties for fiscal years 2001 to 2019. Over the course of the dispute, the amount in controversy ballooned from the initial $5.6 million requested by the DOT in 2005 to $94 million as of 2019.

The day after the Supreme Court of India issued its decision, Hughes India e-mailed DirecTV to seek indemnification for the judgment, and DirecTV formally declined.

## II.    The District Court Proceeding

On March 27, 2020, Hughes India sued DirecTV in the United States District Court for the Southern District of New York, alleging that DirecTV had

wrongfully denied Hughes India's request for indemnification of the license fees, interest, and penalties imposed by the DOT. After the district court denied DirecTV's motion to dismiss the complaint, and following discovery, the parties cross-moved for summary judgment on the question of liability, *i.e.*, whether the Agreement's indemnification clause applies to the assessment imposed by the DOT.[3]

On November 16, 2021, the district court granted summary judgment for DirecTV. The court held that the license fees were not subject to indemnification because they were neither indemnifiable Taxes nor the result of indemnifiable Proceedings as defined by the Agreement.

As to Taxes, the court first explained that the Agreement's Taxes provision is narrower than an analogous contractual provision in *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 30 (2008) – where the New York Court of Appeals held that water usage fees constituted a tax under the contract – and that *Innophos* is not controlling. Although the court acknowledged that the Agreement indemnified fees similar to franchise and excise taxes, and that the license fees had

_____

[3] The parties agreed to separately address what amount DirecTV must pay if obligated to indemnify Hughes India.

"substantial likenesses" to those taxes, the court rejected Hughes India's argument that the license fees fell within the contractual definition of Taxes. Special App'x 7. In distinguishing license fees from franchise and excise taxes respectively, the court explained that: (1) a "franchise tax typically is applied to a general classification of companies," whereas a "license fee typically is applied to a specific activity, here, satellite services"; and (2) unlike an excise tax that is typically charged to operate a business, the license fee is imposed by the DOT "because India, as a sovereign, owned the air above its territory, and charged for the privilege of 'moving' communications through the airways." *Id.* at 6-7. The court emphasized that the omission of the term "license" from the Agreement's definition of Taxes further indicates that Hughes India assumes responsibility for such costs.

With regard to indemnification pursuant to the Proceedings provision, the court summarily concluded that neither Hughes India's "protestations and discussions concerning the correctness of the license fee" nor Hughes India's "efforts to reduce the fee charged"constituted a Proceeding against Hughes India as defined in the Agreement. *Id. at* 7-8. Accordingly, the court granted summary judgment in favor of DirecTV.

11

This appeal followed.

## DISCUSSION

Hughes India argues that the district court erred in dismissing the complaint for two reasons: (1) the license fees constitute Taxes under the Agreement and (2) the DOT initiated a Proceeding against Hughes India, as defined by the Agreement. We address each argument in turn.

## I.    Legal Standards

### A.    Standard of Review

"We review a district court's decision to grant summary judgment *de novo*, construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor." *Picard, Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 182-83 (2d Cir. 2022), quoting *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). We affirm "only if there is no genuine issue of material fact and the prevailing party was entitled to judgment as a matter of law," *Harris*, 818 F.3d at 57, but summary judgment "must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 465 (2d Cir. 2001) (internal quotation marks

12

omitted).

     *B.*     *Contract Interpretation*

"It is axiomatic under New York law, which the parties agree applies, that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (alteration and internal quotation marks omitted). "The terms of an agreement provide the best evidence of what the parties intend . . . ." *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019). "New York law requires indemnification agreements to be strictly construed; a court cannot find a duty to indemnify absent manifestation of an 'unmistakable intention' to indemnify." *Manley v. Ambase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003), quoting *Heimbach v. Metro. Transp. Auth.*, 75 N.Y.2d 387, 392 (1990). We agree with the parties that the contract is clear and unambiguous, and therefore "must be enforced according to the plain meaning of its terms." *Abdullayeva*, 928 F.3d at 222, quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002).

## II.    Taxes

Hughes India argues that the district court erred in concluding that the license fees are not Taxes under *Innophos* and the plain meaning of the

13

Agreement.

A.     *Applicability of Innophos*

Hughes India first argues that "[t]he reasoning of *Innophos* applies directly here and demonstrates that the license fees" qualify as Taxes. Appellant's Br. 25, citing *Innophos*, 10 N.Y.3d at 25.

The decision of the New York Court of Appeals in *Innophos* guides our analysis but does not, by itself, dictate the outcome of this dispute. In *Innophos*, phosphate companies operating in Mexico entered into a purchase agreement that required the defendants to indemnify the plaintiff for all "taxes" accrued by the closing date. 10 N.Y.3d at 27-28. The purchase agreement broadly defined taxes as:

> United States federal, state or local or non-United States
> taxes, assessments, charges, duties, levies or other
> similar governmental charges of any nature, including
> all income, gross receipts, employment, franchise,
> profits, capital gains, capital stock, transfer, sales, use,
> occupation, property, excise, severance, windfall profits,
> stamp, stamp duty reserve, license, payroll,
> withholding, ad valorem, value added, alternative
> minimum, environmental, customs, social security (or
> similar), unemployment, sick pay, disability,
> registration and other taxes, assessments, charges,
> duties, fees, levies or other similar governmental
> charges of any kind whatsoever, whether disputed or

14

not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest.

*Id.* at 27-28. After the transaction closed, a Mexican government agency ordered the plaintiff to pay outstanding water usage fees that had accrued prior to closing. The water usage fees were mandatory charges imposed in exchange for a company's exploitation of Mexico's natural resources and were determined by calculating the volume of water extracted. *Id.* at 30.

The plaintiff commenced an action seeking a declaration that the water usage fees were indemnifiable taxes as defined by the purchase agreement. The New York Supreme Court held that the water fees "constitute taxes, as such term is defined in the purchase agreement . . . [, which] doesn't confine itself to what we would think of as taxes in the classic sense." *Id.* (alterations in original). The Appellate Division echoed that view, rejecting the defendant's argument that the charges were not subject to indemnification because they were not taxes under Mexican law.  832 N.Y.S.2d 197 (1st Dep't 2007). "The relevant issue," the Appellate Division explained, "[wa]s not whether the [] assessment is a tax under New York or Mexican law, but rather whether the [] assessment is considered a tax as that term is defined in the parties' agreement." *Id.* The Court of Appeals

15

affirmed, reiterating that the water fees were similar to a severance tax and therefore subject to indemnification. 10 N.Y.3d at 30-31.

Some similarities between *Innophos* and the instant case are readily apparent: the parties in both cases entered purchase agreements that required the indemnification of contractually defined taxes accrued for taxable periods that end on or before the closing date; the purchase agreements do not "confine [themselves] to what we would think of as taxes in the classic sense," *id.* at 27, but broadly define taxes to include "similar" government charges; and a foreign government agency imposed mandatory fees, which had accrued pre-closing. But our analysis does not end there. As the district court pointed out, *Innophos* involves materially different contractual language with a slightly different list of exemplary taxes than the Agreement at issue. *See Am. Food & Vending Corp. v. Amazon.com*, Inc., 186 N.Y.S.3d 401 (1st Dep't 2023) ("In law . . . the same words, placed in different contexts, sometimes mean different things." (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015))). Unlike in *Innophos*, where the court concluded that water usage fees imposed on a phosphate business were analogous to severance taxes, 10 N.Y.3d at 30, Hughes India argues that the license fees imposed on its telecommunications satellite business are analogous to

franchise taxes, excise taxes, assessments, deficiencies, and levies.

In light of the contractual and contextual variations between the cases, *Innophos* is not directly controlling here. The decision, however, highlights underlying principles of New York law that guide our analysis: (1) a fee – such as the license fee here and the water usage fee in *Innophos* – may be construed as a Tax, regardless of how it is labeled, if it is "similar" to the enumerated examples in the Taxes provision of the Agreement and (2) whether a fee is subject to indemnification depends on the plain meaning of Taxes as defined by the Agreement and not on the classification of the fee under New York law or under the law of the country where it is imposed. Since "[o]ur 'fundamental objective' is to determine the intent of the contracting parties," the Court must examine "the language employed in the contract." *Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 527 (2d Cir. 2005), quoting *Abiele Contracting, Inc. v. N.Y. City Sch. Constr. Auth.*, 91 N.Y.2d 1, 9 (1997).

B.      *Plain Meaning of the Agreement*

Hughes India next argues that the license fees are subject to indemnification because they are charges by a governmental authority similar to franchise taxes, excise taxes, assessments, deficiencies, and levies.

17

"Franchise taxes are excise taxes imposed on corporate entities for the privilege of carrying on a business as a corporation," *Astoria Fed. Sav. & Loan Ass'n v. State*, 644 N.Y.S.2d 926, 930 (1996), "for the privilege of existing as a corporation," or for a "corporation's privilege of doing business within the boundaries of the taxing authority," *Bankers Trust N.Y. Corp. v. Dep't of Finance of City of New York*, 79 N.Y.2d 457, 460 (1992); *see also Franchise Tax*, Black's Law Dictionary (11th ed. 2019) (noting that a franchise tax is "imposed [for] the privilege of carrying on a business"). Franchise taxes are measured by the income or revenue of a corporation and "require[] the earning of income . . . to coincide with the prerogative of doing business in the corporate form" such that if the corporation "were to dissolve or cease doing business in the [state] they would no longer be subject to the tax." *Bankers Trust*, 79 N.Y.2d at 462-63.

Whether a tax "is a bona fide franchise tax[] is a matter to be 'determined by its operation rather than by particular descriptive language which may have been applied to it.'" *Id.* at 462, quoting *Educ. Films Corp. v. Ward*, 282 U.S. 379, 387 (1931). "That the tax does not contain the word 'franchise' in its title or text is not determinative." *Id.* at 462; *cf. Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d

18

1388, 1399 (7th Cir. 1992) (explaining that a city cannot "circumvent [regulatory] limitation[s] by calling a tax something else, such as a 'franchise fee'" because the "test is functional"). While franchise taxes may be imposed on corporations generally, *see, e.g.*, N.Y. Tax Law § 209 (applicable to all corporations doing business in New York), they may also be imposed, contrary to the district court's conclusion, upon a particular industry or a corporation engaging in a specific activity, *see, e.g.*, N.Y. Tax Law § 182 (certain oil companies); N.Y. Tax Law § 183 (transportation and transmission companies); N.Y. Tax Law § 186-a (telecommunications, gas, and electricity businesses); N.Y. Tax Law § 1501 (insurance companies).

Here, the license fees issued by the DOT are similar to franchise taxes because they are mandatory fees imposed for the privilege of conducting business as a telecommunications corporation in India and are calculated based on a corporation's revenue. As the Supreme Court of India explained, the Indian government imposed a "revenue sharing regime, which was the price [for] parting with the exclusive privilege which the [government] had . . . to carry on telecommunication activities." App'x 585, 598. Although "a licence granted under . . . Section 4 of the Telegraph Act is in the nature of a contract between the

19

[Indian] Government and the licensee," App'x 576, Hughes India cannot operate a telecommunications business in India without paying the license fees, and "if [Hughes India] were to dissolve or cease doing business in [India] they would no longer be subject to the [license fees]," *Bankers Trust*, 79 N.Y.2d at 463; *see also New Jersey v. Anderson*, 203 U.S. 483, 490 (1906) (concluding that, for purposes of the bankruptcy code, a license fee was a franchise tax "imposed upon the right of the corporation to continue to be a corporation").

Similar to New York's franchise tax, N.Y. Tax Law § 186-a, which is imposed on "the gross income of providers of telecommunications" in the State, *Lawlor v. Cablevision Systems Corp.*, 839 N.Y.S.2d 433 (Sup. Ct. 2007), the license fee Hughes India must pay is calculated as a percentage of its adjusted gross revenue for the privilege of operating in India, "regardless of whether the entity shows a net profit," *Savings Bank v. Tax Comm'n*, 485 N.Y.S.2d 903 (4th Dep't 1985). Taken together, the license fee is "similar" to a franchise tax and therefore falls within the scope of the Agreement's definition of Taxes.

DirecTV's arguments do not persuade us otherwise. DirecTV contends that the license fees are not similar to franchise taxes because they "lack the unique attributes of taxes – they are not mandatory payments, required by the

20

legislature, collected by the taxing authority, for which the taxpayer does not receive a specific benefit in exchange." Appellee's Br. 39. But the Agreement does not require that the license fees possess any of the "unique attributes" that DirecTV cites in order to be indemnifiable. To the contrary, the license fees need only be a "*similar* charge[] of every kind, *character*, or description" to the enumerated examples of Taxes. App'x 114 (emphases added). As the New York Court of Appeals explained in *Innophos*, it is sufficient that "the [license] fees are 'similar,' though not identical, to a [franchise] tax." 10 N.Y.3d at 30 (rejecting the defendants' argument that the water fees were not indemnifiable because they were not in the nature of taxes).

Moreover, even under DirecTV's narrow reading of the Agreement, the license fees possess the "unique attributes" of a franchise tax: they are mandatory payments imposed by the Indian government and collected by the DOT pursuant to the Telegraph Act for the specific benefit of conducting a telecommunications business within India. *See, e.g.*, *Texas Coalition of Cities v. F.C.C.*, 324 F.3d 802, 806 (5th Cir. 2003) (noting that franchise fees, under federal law, include "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely

21

because of their status as such"); *Willoughby Rehab. v. Webster*, 22 N.Y.S.3d 81 (2d Dep't 2015) (concluding that sellers were obligated to indemnify buyers for an assessment imposed upon healthcare facilities because the assessment was generally considered a gross receipts tax in New York); 14A Fletcher Cyc. Corp. § 6893 (updated Sept. 2022) (noting that although there are some decisions to the contrary, "[a]nnual license fees imposed on corporations are generally assumed to be a tax, within the legal meaning of the term").

DirecTV also argues that construing the license fees as a Tax renders the Agreement superfluous because under such an interpretation, any governmental charge would be considered a Tax. But the New York Court of Appeals rejected that same argument in *Innophos*, 10 N.Y.3d at 29-30. Given the "sweeping language" of the Agreement, DirecTV's "strained interpretation would eviscerate language that is obviously intended to cover the charges at issue here." *Innophos*, 832 N.Y.S.2d at 197 ("It is virtually impossible for us to imagine how two sophisticated parties could have made the language any more sweeping than it is."). While there may be grey areas and borderline cases that arise with other government charges, we need not grapple with hypothetical situations or facts that are not before us. The license fee is sufficiently "similar" to a franchise tax to

22

come within the plain meaning of "Taxes" as defined in the Agreement, and interpreting the Agreement accordingly does not create unbounded or absurd liabilities.[4]

That being said, DirecTV's liability for the license fees is not boundless. To the extent that Hughes India asserts that license fees accrued post-closing are subject to indemnification, we disagree. Under the Agreement, DirecTV is responsible for Taxes related to Communications Licenses accrued for tax periods ending on or before the closing date, whereas Hughes India is responsible for those accrued after the transaction's closing date. The Agreement evinces a clear allocation of responsibility between the parties based on the closing date. This bright-line division is logical in light of the fact that license fees, a contractually defined Tax related to Communications Licenses, are an integral and ongoing operating cost for a telecommunications business. Having each party be held responsible for the license fees incurred while that party operated the telecommunications business "appeals to a sense of fundamental fairness and

_____

[4] Because we conclude that the license fees are similar to franchise taxes and therefore satisfy the contractual definition of Taxes, we do not address Hughes India's additional arguments that the license fees are similar to excise taxes, assessments, deficiencies, and levies.

promotes the value of personal responsibility." *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 211-12 (S.D.N.Y. 2010) (rejecting an "absolutist approach" that would make either party liable for one hundred percent of the underlying damages and concluding that the seller must indemnify losses that resulted from the pre-closing operation of a business and buyer must bear its post-closing damages because the parties' agreement made the closing date "a bright-line for the division of responsibility"); *see also Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 143 (2004) (declining to interpret a purchase agreement to make the seller liable for losses arising from products sold after the closing date because such an approach "would be at odds with th[e] [purchase agreement's] careful allocation of liability" based on the closing date). The Agreement is unambiguous and permits no other interpretation.

In sum, we conclude that license fees are Taxes on Communications Licenses as defined by the Agreement. Accordingly, DirecTV must indemnify Hughes India for the license fees, interest, and penalties accrued for tax periods ending on or before the closing date.

III.    Proceeding

Hughes India argues that the district court erred in concluding that the DOT's service of the Provisional Assessment to the company before the closing date fails to satisfy the Agreement's definition of a Proceeding. In support, Hughes India asserts that the Provisional Assessment arose from an initial "audit" or "examination," which was followed by an "inquiry" by the DOT, and culminated in a "hearing" where Hughes India presented relevant information for the DOT's consideration. Appellant's Br. 43, 45. Hughes India further contends that its effort to seek redress from the DOT using administrative processes is a Proceeding under the ordinary meaning of the term.

Generally, a "proceeding" is the "regular and orderly progression of a lawsuit," the "procedural means for seeking redress from a tribunal or agency," or an "act or step that is part of a larger action." *Proceeding*, Black's Law Dictionary (11th ed. 2019). Although the term is often used to "express the business done in courts," *id.*, the Agreement broadly defines Proceeding to include actions – such as an "audit," "examination," "inquiry," and "investigation" – that are not generally considered judicial proceedings. App'x 112. Such actions are not necessarily formal, adversarial, or before a third-party adjudicator. *See Audit*, Black's Law Dictionary (11th ed. 2019) (defining an audit

25

as a "formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards"); *id.* at *Examination* (defining an examination as, among other things, "[a] close look at a person or thing to determine its condition"); *id.* at *Inquiry* (defining an inquiry as "[t]he act or process of posing questions to elicit information"); *id.* at *Investigation* (defining an investigation as the "activity of trying to find out the truth about something").[5] Contrary to DirecTV's assertion, therefore, the question is not whether the DOT's actions before the closing date "reflect[ ] the . . . common meaning" of Proceeding, Appellee's Br. 48-49, but whether the DOT's actions constitute a Proceeding under the plain meaning of the Agreement, which provides its own mutually agreed-upon definition of the term for purposes of the transaction. "When the parties have agreed to conduct themselves in accordance with the rights and duties expressed in a contract, the court should strive to give

---

[5] Because the Agreement was drafted and revised by lawyers, a legal dictionary is more relevant for our review of its terms than a general dictionary. As with the definition of "Taxes," the breadth of the definition of "Proceeding" is emphasized by the considerable overlap among the types of exemplary actions that its definition includes. Many of the listed examples are inconsistent with any contention that the DOT's inquiry into the accuracy of DirecTV's calculation of its gross revenues does not qualify as a Proceeding because it is not akin to a lawsuit before a neutral tribunal.

a fair and reasonable meaning to the language used." *Misty Cleaning Serv. Inc. v. Indep. Grp. Home Living Program, Inc.*, 120 N.Y.S.3d 709 (Sup. Ct. 2020), citing *Abiele Contracting*, 91 N.Y.2d at 9.

We agree with Hughes India that the DOT initiated a Proceeding for fiscal years 2001 to 2003 because the DOT conducted an audit, examination, and investigation of Hughes India's records, which culminated in a Provisional Assessment. "Based on the various . . . audited accounts submitted by [Hughes India]," App'x 786, the DOT took a "close look," *Examination*, Black's Law Dictionary (11th ed. 2019), and "formal[ly] examin[ed] [Hughes India's] accounting records, financial situation, or compliance with" the Licensing Agreement, *id.* at *Audit*. In essence, the DOT reviewed Hughes India's information "to find out the truth about" the license fee payments. *Id.* at *Investigation*. The DOT's audit, examination, and investigation revealed a deficiency in license fee payments, which was detailed in a Provisional Assessment that requested Hughes India to remit payment. By the Agreement's plain language, the DOT's Provisional Assessment initiated a Proceeding against Hughes India.

Because the Provisional Assessment for fiscal years 2001 to 2003 was dated

27

March 2005 – *i.e.*, prior to the closing in April 2005 – DirecTV is liable for the

unpaid license fees, interest, and penalties stemming from *that* Proceeding.

However, we disagree with Hughes India's implicit argument that subsequent

provisional assessments imposed upon the company post-closing, *see, e.g.*, App'x

803 (provisional assessment dated March 2006 for unpaid license fees accrued

during fiscal years 2003 to 2004), merged into the Provisional Assessment for

fiscal years 2001 to 2003 initiated pre-closing in order to create one decades-long

proceeding.[6] Neither the fact that the legal theories advanced by Hughes India

with respect to the DOT's calculations were consistent throughout the Indian

litigation nor the fact that the conclusions reached by the DOT for fiscal years

2001 to 2003 were ultimately affirmed by the Supreme Court of India in the same

---

[6] At oral argument, counsel for Hughes India suggested that because the parties agreed to defer the calculation of damages, we need not decide whether the DOT's audit, examination, and investigation, which initiated a Proceeding in March 2005 is distinct from subsequent audits, examinations, and investigations that culminated in the Supreme Court of India's 2019 judgment, *i.e.*, whether this dispute concerns separate Proceedings or a single one. We disagree. The question is squarely presented by the parties on appeal and is one of liability, not damages. The parties dispute the existence and extent of DirecTV's liability for an alleged Proceeding. Thus, consistent with the ordinary roles of district and appellate courts, and in light of the parties' stipulation, we resolve the contract interpretation dispute before us and leave the calculation of damages to the district court.

judgment that resolved later audits of Hughes India's revenues for later years alters the conclusion that the DOT conducted separate Proceedings – audits, examinations, and investigations – for various years.

The Agreement requires DirecTV to indemnify Hughes India for liabilities arising from "Proceedings . . . initiated prior to the Closing Date," *id.* at  44, 92 § 9.5, whereas Hughes India is responsible for liabilities from Proceedings "created or incurred on or after Closing,"*id.* at 42 § 2.4(a)(xii), 43 § 2.4(a)(xvi), 163. The Agreement shows a clear and unambiguous intent to allocate responsibility based on the date a Proceeding is "initiated" or "created," and *not* based on the date of the conduct underlying the Proceeding. Thus, each provisional assessment imposed by the DOT initiates or creates a new Proceeding, and DirecTV must indemnify only provisional assessments that pre-date the closing. That holds regardless of whether a provisional assessment dated post-closing ascertains liability for fiscal years pre-closing. *See McCoy v. Medford Landing, L.P.*, 84 N.Y.S.3d 224 (2d Dep't 2018) (noting that "the right to contractual indemnification depends upon the specific language of the contract" (quoting *Davis v. Catsimatidis*, 12 N.Y.S.3d 141 (2d Dep't 2015)). Because the only provisional assessment initiated pre-closing addressed deficiency in payments

for fiscal years 2001 to 2003, DirecTV is liable only for the unpaid license fees, interest, and penalties that accrued for those years.[7]

Again, the Agreement's allocation of responsibility between the parties is commercially reasonable because it absolves DirecTV of indefinite liability and passes the baton to Hughes India for disputes that are created after it assumes control. *See, e.g., Grant-Howard Assocs. v. Gen. Housewares Corp.*, 63 N.Y.2d 291, 298 (1984) (concluding that the seller-defendant was not obligated to indemnify a customer's injuries sustained post-closing but caused by a faulty product sold pre-closing because the injury was not an "existing liability" under the purchase agreement and the defendant "would be unable to meaningfully limit its liability as every item ever sold by the predecessor would be a potential source of assumed liability"). Given the unambiguous language in the Agreement, DirecTV is not obligated to indemnify Hughes India's provisional assessments and underlying license fees in perpetuity. *See Spanski Enters. v. Telewizja Polska S.A.*,

---

[7] Nor does the lawsuit that resulted in the Supreme Court of India's judgment constitute a Proceeding that requires DirecTV to indemnify Hughes India for the entire judgment issued by that court. The Agreement requires indemnification for "Proceedings *against* [Hughes India] . . . initiated *prior to the Closing Date*." App'x 44 § 2.4(b)(ix) (emphases added). The administrative action that culminated in the Supreme Court of India's decision was filed *by* Hughes India against the DOT *after* the closing date.

832 F. App'x 723, 726 (2d Cir. 2020) (summary order) ("The parties' agreement to specific terms of years . . . strongly suggests that they did not intend for either of them to be able to bind the other in perpetuity."); *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.").

Accordingly, we conclude that the Provisional Assessment initiated pre-closing was a Proceeding regarding license fees accrued for fiscal years 2001 to 2003, and that DirecTV must indemnify Hughes India for the resulting interest and penalties associated with that Provisional Assessment.

## CONCLUSION

We have considered the parties' other arguments and conclude that they are without merit. Thus, for the foregoing reasons, we **VACATE** the district court's judgment and **REMAND** the case to the district court for further proceedings consistent with this opinion.

31